[Cite as *State v. Smith*, 2020-Ohio-427.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                       CASE NO. 13-19-26

      v.

ANTONIO M. SMITH,                       O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 18 CR 0282

Judgment Affirmed

Date of Decision: February 10, 2020

APPEARANCES:

    *Brian A. Smith* for Appellant

    *Angela M. Boes* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Antonio M. Smith ("Smith"), appeals the June 25, 2019 judgment of sentence of the Seneca County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case stems from four controlled drug purchases conducted in Fostoria, Ohio in July and August 2018. To arrange each of the purchases, a confidential informant used Facebook and Facebook Messenger to communicate with a person who used a Facebook account registered in Smith's name. Smith was physically present at only two of the controlled drug purchases. During the other two operations, the confidential informant transacted solely with Smith's twin brother, Marques Smith ("Marques"). By the end of the investigation, the four controlled buys had yielded cocaine as well as alprazolam pills.

{¶3} On December 7, 2018, the Seneca County Grand Jury indicted Smith on five counts: Count One of trafficking in cocaine in violation of R.C. 2925.03(A)(1), (C)(4)(a), a fifth-degree felony; Count Two of trafficking in drugs in violation of R.C. 2925.03(A)(1), (C)(2)(a), a fifth-degree felony; Count Three of complicity to trafficking in cocaine in violation of R.C. 2923.03(A)(2), (F) and 2925.03(A)(1), (C)(4)(b), a fourth-degree felony; and Counts Four and Five of complicity to trafficking in cocaine in violation of R.C. 2923.03(A)(2), (F) and 2925.03(A)(1), (C)(4)(a), fifth-degree felonies. (Doc. No. 1). Count Three of the

indictment included an enhancement specifying that the charged offense was committed in the vicinity of a juvenile. (*Id.*). On December 19, 2018, Smith appeared for arraignment and entered pleas of not guilty to the counts contained in the indictment. (Doc. No. 8).

{¶4} A jury trial was held on May 6-8, 2019. During the course of the trial, Smith moved for a mistrial, which the trial court denied. (May 6-8, 2019 Tr., Vol. II, at 244-247). On May 8, 2019, the jury found Smith guilty on all counts, and it found that the offense charged in Count Three was committed in the vicinity of a juvenile. (Doc. No. 26).

{¶5} On June 24, 2019, the trial court sentenced Smith to 10 months in prison on Count One, 10 months in prison on Count Two, 15 months in prison on Count Three, 10 months in prison on Count Four, and 10 months in prison on Count Five. (Doc. No. 33). The trial court ordered that the sentences for Counts One, Two, and Three be served consecutively to each other and that the sentences for Counts Four and Five be served concurrently with each other and concurrently with the consecutive sentences imposed for Counts One, Two, and Three. (*Id.*). Thus, the trial court sentenced Smith to an aggregate term of 35 months in prison. (*Id.*). The trial court filed its judgment entry of sentence on June 25, 2019. (*Id.*).

{¶6} On July 10, 2019, Smith filed a notice of appeal. (Doc. No. 37). He raises three assignments of error for our review.

## Assignment of Error No. I

**Because the jury lost its way and created a manifest miscarriage of justice in finding Appellant guilty of Trafficking in Cocaine, Trafficking in Drugs, and Complicity to Trafficking in Cocaine, Appellant's convictions were against the manifest weight of the evidence.**

{¶7} In his first assignment of error, Smith argues that his trafficking-in-cocaine, trafficking-in-drugs, and complicity-to-trafficking-in-cocaine convictions are against the manifest weight of the evidence. Specifically, Smith argues that his convictions are against the manifest weight of the evidence because the evidence does not support a finding that he was the person who sent the Facebook messages to the confidential informant arranging the drug sales. (Appellant's Brief at 8-11). In addition, Smith argues that the evidence weighs against a finding that one of the offenses was committed in the vicinity of a juvenile, as charged in Count Three of the indictment, because the State's witnesses offered only estimates of the distance between the juveniles and the drug transaction and simply speculated that juveniles could have seen the transaction. (*Id.* at 11-12). Finally, Smith argues that his convictions are against the manifest weight of the evidence because they are based largely on the testimony of the confidential informant who, according to Smith, "was not credible due to his financial incentive to cooperate with police" and "was also not credible due to his prior criminal history." (*Id.* at 12-13).

**{¶8}** In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

**{¶9}** Smith was convicted of one count of trafficking in cocaine, one count of trafficking in drugs, and three counts of complicity to trafficking in cocaine. The offenses of trafficking in cocaine and trafficking in drugs are codified in R.C. 2925.03(A)(1), which provides that "[n]o person shall knowingly * * * [s]ell or offer to sell a controlled substance or a controlled substance analog." "A person acts knowingly, regardless of purpose, when the person is aware that the person's

conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶10} R.C. 2923.03, Ohio's complicity statute, provides, in relevant part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2).

> To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. ""'"Evidence of aiding and abetting may be shown by either direct or circumstantial evidence, and participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed."'" *State v. Wright*, 3d Dist. Hardin No. 6-15-14, 2016-Ohio-5465, ¶ 9, quoting *State v. Rowe*, 3d Dist. Seneca No. 13-10-14, 2011-Ohio-5739, ¶ 32, quoting *State v. Gragg*, 173 Ohio App.3d 270, 2007-Ohio-4731, ¶ 21 (12th Dist.).

{¶11} Finally, with respect to the complicity-to-trafficking-in-cocaine offense charged in Count Three of the indictment, it was alleged that the trafficking-in-cocaine offense to which Smith was allegedly complicit was committed in the vicinity of a juvenile. An offense is committed in the vicinity of a juvenile if

> the offender commits the offense within one hundred feet of a juvenile
>
> or within the view of a juvenile, regardless of whether the offender
>
> knows the age of the juvenile, whether the offender knows the offense
>
> is being committed within one hundred feet of or within view of the
>
> juvenile, or whether the juvenile actually views the commission of the
>
> offense.

R.C. 2925.01(BB).

{¶12} At trial, the State first offered the testimony of Detective Brandon Bell ("Detective Bell") of the City of Fostoria Police Department. (*See* May 6-8, 2019 Tr., Vol. I, at 95-96). Detective Bell testified that the first controlled drug purchase took place on July 23, 2018 at Marques's house. (*Id.* at 119-120, 125-126). The confidential informant initially advised Detective Bell that crack cocaine would be purchased from Smith and that alprazolam pills would be purchased from a second individual. (*Id.* at 120-121). Detective Bell testified that, after completing the purchase and exiting Marques's house, the confidential informant was picked up, at which time he turned over to officers "what appeared to be crack cocaine * * * [and]

18 alprazolam or Xanax tablets * * *." (*Id.* at 129). Detective Bell stated that the confidential informant was paid $100 for his role in the July 23, 2018 controlled buy. (*Id.* at 137). Detective Bell was then shown State's Exhibit 15, a still photograph adapted from a frame of the covert video recording of the July 23, 2018 controlled buy, and he testified that Smith was the person depicted in the photograph conducting the sale. (*Id.* at 144-145); (State's Ex. 15).

{¶13} Detective Bell then testified about the second controlled drug transaction. (May 6-8, 2019 Tr., Vol. II, at 145). Detective Bell stated that the second controlled purchase took place on August 9, 2018 at Jackson Park in Fostoria, Ohio and that the same confidential informant conducted the purchase. (*Id.* at 145, 148-149). Detective Bell stated that he was told by the confidential informant that the confidential informant had "set up the [August 9, 2018] controlled purchase [of cocaine] with * * * Smith utilizing Facebook Messenger or Facebook." (*Id.* at 145-146, 156). Detective Bell testified that the confidential informant allowed him to view the Facebook messages and that the messages consisted of "normal drug talk." (*Id.* at 157-158). Detective Bell testified that he believed that the Facebook messages he viewed on the confidential informant's phone were sent by Smith because the "header" on the message thread indicated that the messages were being sent from a Facebook account registered in Smith's name. (*Id.* at 157-158).

**{¶14}** Detective Bell stated that on August 9, 2018, he dropped off the confidential informant at Jackson Park, where the confidential informant waited on a park bench until a black Cadillac arrived. (*Id.* at 150). The confidential informant then entered the vehicle, and the vehicle traveled a short distance before the confidential informant was let out of the car and picked up by Detective Bell. (*Id.*). Detective Bell was able to determine that the black Cadillac was registered to Marques. (*Id.* at 151). Once the confidential informant was picked up by Detective Bell, he turned over a package containing cocaine to Detective Bell. (*Id.* at 152). According to Detective Bell, although the confidential informant said that he had planned to purchase the cocaine directly from Smith and thought he would be meeting with Smith, he actually purchased the cocaine from Marques. (*Id.* at 155-156). Detective Bell testified that after reviewing the covert video recording of the controlled purchase and still images adapted from that recording, he was able to identify Marques as the seller of the cocaine during the August 9, 2018 controlled buy. (*Id.* at 164-166); (State's Exs. 5, 6). Detective Bell testified that the confidential informant was paid $125 for participating in the August 9, 2018 purchase. (May 6-8, 2019 Tr., Vol. II, at 153).

**{¶15}** Detective Bell also testified that juveniles were present in Jackson Park during the August 9, 2018 controlled purchase. (*Id.* at 158). According to Detective Bell, juveniles were observed playing "just north" of the street that bisects

the park, and he testified that the confidential informant estimated that the children were approximately 75 feet away from the controlled buy—an estimate that was confirmed by another officer at the scene who observed the juveniles. (*Id.* at 159).

**{¶16}** Next, Detective Bell testified that a third controlled drug purchase was conducted by the same confidential informant on August 13, 2018. (*Id.* at 166). Detective Bell stated that the confidential informant once again used Facebook to arrange the transaction with Smith. (*Id.*). However, unlike the earlier controlled purchases, the confidential informant also had contact with Marques via Facebook. (*Id.* at 179). Detective Bell testified that the confidential informant showed him the messages sent from both Smith's account and Marques's account and that he documented the messages by taking photographs of the messages. (*Id.* at 179-181); (State's Exs. 25, 27). Detective Bell testified that he believed that Smith and Marques were the persons who sent the messages because the "headers" on the message threads indicated that the messages were being sent from Smith's and Marques's Facebook accounts, respectively. (May 6-8, 2019 Tr., Vol. II, at 180-181). Detective Bell stated that the messages between Smith and the confidential informant are "consistent with that of setting up a drug purchase." (*Id.* at 181).

**{¶17}** Detective Bell stated that the August 13, 2018 controlled drug purchase also took place at Jackson Park. (*Id.* at 168-169). During this operation, the confidential informant waited until a white GMC SUV pulled into the park. (*Id.*

at 169). Detective Bell testified that the white GMC SUV was registered to Smith's girlfriend and that Smith was listed as an additional owner on the registration. (*Id.* at 170). He stated that once the SUV arrived, the confidential informant entered the vehicle, after which the vehicle traveled a short distance on the streets surrounding the park before the confidential informant exited the vehicle. (*Id.* at 170-171). After exiting the vehicle, the confidential informant turned over a baggie containing cocaine. (*Id.* at 171). Detective Bell testified that the confidential informant received $125 for the August 13, 2018 operation. (*Id.* at 176).

{¶18} Detective Bell stated that the August 13, 2018 controlled purchase did not occur as expected. (*Id.* at 177). He stated that although the confidential informant had arranged to buy the cocaine directly from Smith, the cocaine was actually purchased directly from Marques. (*Id.* at 178). According to Detective Bell, Smith was driving the white GMC SUV and Marques was in the passenger seat. (*Id.*). Because Smith was driving, the transaction was ultimately completed with Marques. (*Id.*). Detective Bell was able to identify both Smith and Marques from the covert video recording of the controlled drug purchase and the still images derived from that recording. (*Id.* at 183); (*See* State's Exs. 8, 9, 10, 11). Specifically, Detective Bell was able to identify Smith as the driver of the vehicle. (May 6-8, 2019 Tr., Vol. II, at 185); (State's Ex. 9).

{¶19} Detective Bell then testified that a fourth and final controlled drug purchase took place on August 30, 2018. (May 6-8, 2019 Tr., Vol. II, at 186). Detective Bell testified that the same confidential informant arranged the controlled purchase by messaging the Facebook account registered in Smith's name. (*Id.* at 187). As with the earlier controlled drug purchases, Detective Bell testified that he observed the Facebook messages between Smith's account and the confidential informant, and he testified that the content of the messages was consistent with what the confidential informant had said he talked about with Smith. (*Id.* at 197-199). However, unlike the previous transactions, Detective Bell and the confidential informant knew in advance that Smith would not be conducting the sale personally. (*Id.* at 187). Detective Bell testified that when the confidential informant made contact with Smith to set up the August 30, 2018 controlled buy, Smith told the confidential informant that Smith's uncle would be doing the transaction. (*Id.*).

{¶20} Detective Bell testified that Jackson Park was once again the site of the controlled purchase. (*Id.* at 190). He stated that on August 30, 2018, the confidential informant entered Jackson Park and waited for Smith's uncle. (*Id.*). However, rather than Smith's uncle, Marques appeared in the park driving his black Cadillac. (*Id.* at 191). Detective Bell stated that the confidential informant entered the Cadillac and that, after exiting the vehicle, the confidential informant turned over a quantity of cocaine. (*Id.* at 191-192). Detective Bell testified that the

confidential informant revealed that the cocaine had been purchased from Marques. (*Id.* at 197-198). Detective Bell was able to identify Marques as the driver of the Cadillac by viewing the covert video recording and the still photographs derived therefrom. (*Id.* at 201-202); (State's Exs. 13, 14). Detective Bell testified that the confidential informant was paid $50 for his role in the August 30, 2018 operation. (May 6-8, 2019 Tr., Vol. II, at 196). Finally, Detective Bell testified that it is not uncommon for a person other than the coordinator of a drug transaction to actually make the sale. (*Id.* at 202). He observed that, many times, the transactions are planned by middlemen or go-betweens. (*Id.* at 203).

{¶21} On cross-examination, Detective Bell testified that, to the best of his knowledge, the confidential informant received only monetary compensation for his participation in the controlled drug purchases and that he did not receive special consideration with respect to pending criminal charges. (*Id.* at 206-207). Detective Bell testified that it is not uncommon for confidential informants to participate in controlled drug operations for purely financial reasons. (*Id.* at 214). He also stated that he did not subject the confidential informant to drug testing and that he only visually assessed whether the confidential informant was under the influence of drugs. (*Id.* at 210).

{¶22} Detective Bell further testified that although he took pictures of only the Facebook messages used to arrange the August 13, 2018 controlled drug

purchase, he personally observed the messages used to arrange the other controlled buys. (*Id.* at 211). He stated that the Facebook messages allegedly sent by Smith did not explicitly reference drugs, and he conceded that he did not know for certain who wrote the messages sent via Smith's Facebook account. (*Id.* at 211-212). However, he testified that it was possible, but "[n]ot probable," that someone other than Smith sent the messages from Smith's account. (*Id.* at 216).

{¶23} In addition, Detective Bell reiterated that Smith was not physically present either during the August 9, 2018 controlled purchase, the controlled purchase that allegedly took place within the vicinity of a juvenile, or during the August 30, 2018 controlled purchase. (*Id.* at 212). Detective Bell admitted that he did not obtain a precise measurement of the distance between the black Cadillac in which the confidential informant purchased the drugs and the juveniles playing in Jackson Park. (*Id.* at 213). Detective Bell repeated that the 75-foot estimate was "what [he] was advised," and he acknowledged that it was possible that the juveniles "could have been 101 feet" away from the black Cadillac. (*Id.*).

{¶24} Finally, on redirect examination, Detective Bell clarified why he believed that it was improbable that someone other than Smith sent the messages from Smith's Facebook account. Referencing the Facebook messages that the confidential informant received from Smith's Facebook account and from

-14-

Marques's Facebook account in connection with the August 13, 2018 buy, Detective Bell explained:

> These messages were sent to and from [Smith] and Marques on the same day, about the same operation, and around the same time frame. It would be improbable for someone to be logged into both of the accounts and have both the phones connecting both messages as representing each other during these operations * * *. [Y]ou assume the person on the other end of that that you're messaging, especially both at the same time, they're both responding that you're going to assume that one of them usually is the one that puts their name on the thing and their profile picture is the one responding.

(*Id.* at 217). In addition, Detective Bell testified that the confidential informant was used to conduct at least 10 controlled purchases, including operations not involving Smith. (*Id.* at 218-219). He testified that it was evident from the observations of law enforcement officers present at the August 9, 2018 controlled purchase that children were within view of the drug transaction. (*Id.* at 218). Finally, he stated that through working with the confidential informant, he found that the confidential informant provided reliable and accurate information and that the confidential informant was truthful and forthcoming in giving his accounts of the controlled purchases. (*Id.* at 219).

{¶25} The State next offered the testimony of the confidential informant. The confidential informant testified that he initiated contact with law enforcement officers and that he wanted to work with law enforcement in conducting controlled purchase operations for "personal reasons." (*Id.* at 223). The confidential informant further testified that he had previously used drugs, that cocaine was his drug of choice, and that he had previous convictions for theft in the Tiffin-Fostoria Municipal Court. (*Id.* at 223-225).

{¶26} The confidential informant then testified about each of the four controlled drug purchases in which he participated. First, the confidential informant confirmed that he arranged the July 23, 2018 purchase with Smith using Facebook Messenger and that, to the best of his knowledge, Smith was the person to whom he sent the messages. (May 6-8, 2019 Tr., Vol. III, at 254). The confidential informant stated that he planned to buy crack cocaine from Smith and alprazolam pills from Smith's uncle. (May 6-8, 2019 Tr., Vol. II, at 227-228). However, according to the confidential informant, when he arrived at Marques's house to conduct the purchase, he purchased both the cocaine and the alprazolam pills directly from Smith. (*Id.* at 230, 234); (May 6-8, 2019 Tr., Vol. III, at 254). The confidential informant testified that the covert video recording of the July 23, 2018 purchase showed that Smith was the person conducting the sale. (May 6-8, 2019 Tr., Vol. II, at 234); (State's Ex. 3).

The confidential informant also stated that he received $100 for participating in the July 23, 2018 purchase. (May 6-8, 2019 Tr., Vol. II, at 238).

{¶27} Next, the confidential informant testified that, like the July 23, 2018 purchase, he arranged the August 9, 2018 purchase via Facebook Messenger by messaging a person he believed to be Smith. (May 6-8, 2019 Tr., Vol. III, at 255). He testified that he showed Detective Bell the Facebook messages exchanged between his account and the account registered in Smith's name. (*Id.* at 265). He also testified that the time frames of the messages he received from Smith's Facebook account corresponded to the time frame of the August 9, 2018 controlled purchase, that he always used Facebook to contact Smith, and that he always received responses from Smith's Facebook account when he attempted to communicate with Smith. (*Id.* at 266).

{¶28} The confidential informant stated that the August 9, 2018 controlled purchase took place at Jackson Park and that although he believed that he would be purchasing drugs from Smith, Marques arrived at Jackson Park alone in a dark colored Cadillac. (*Id.* at 256, 261-263). He testified that after he purchased $250 of cocaine from Marques, he told Detective Bell that he purchased the cocaine from Marques rather than Smith. (*Id.* at 263-264). The confidential informant stated that he received $125 for his role in the August 9, 2018 operation. (*Id.* at 267).

{¶29} The confidential informant also testified that he observed children playing in Jackson Park during the controlled purchase and that he could see them clearly. (*Id.* at 260-261). He estimated that juveniles were approximately 75 feet away from the Cadillac when he entered the vehicle to conduct the purchase, and he testified that children were within view of Marques's vehicle when the controlled purchase took place inside of the vehicle. (*Id.* at 266-267).

{¶30} The confidential informant then testified about the August 13, 2018 controlled purchase. The confidential informant testified that he arranged this transaction by contacting the Facebook account registered in Smith's name and that he believed that Smith was the person who responded. (*Id.* at 270-271). He stated that he also showed these Facebook messages to Detective Bell and that he believed the messages were from Smith because "it was his contact info." (*Id.* at 279-280). The confidential informant also acknowledged that he contacted Marques via Facebook in connection with the August 13, 2018 controlled buy. (*Id.* at 281-282). He testified that Smith and Marques appeared as different Facebook contacts on his phone, that when he was messaging with Marques's account, he assumed that he was communicating with Marques, and that when he was messaging with Smith's account, he assumed he was communicating with Smith. (*Id.* at 281-282).

{¶31} As with the August 9, 2018 buy, the confidential informant testified that the August 13, 2018 buy took place at Jackson Park. (*Id.* at 271-272). The

confidential informant stated that Smith and Marques arrived to Jackson Park together in a vehicle and that Smith was driving the vehicle. (*Id.* at 276-277). Once the confidential informant got into the vehicle, Smith drove a short distance, Marques sold him cocaine, and Smith dropped the confidential informant off. (*Id.* at 272, 277). According to the confidential informant, although Smith was driving, it appeared that Smith "knew and was fully aware of what was going on." (*Id.* at 278-279). The confidential informant testified that he was paid $125 for his role in the August 13, 2018 controlled purchase. (*Id.* at 286).

{¶32} Finally, the confidential informant testified about the August 30, 2018 controlled purchase. The confidential informant testified that the August 30, 2018 buy, like the three other buys, was planned using Facebook Messenger. (*Id.* at 290). The confidential informant testified that he contacted the account registered in Smith's name to arrange the purchase and that he believed that he was communicating with Smith. (*Id.*). He also stated that he showed Detective Bell these Facebook messages. (*Id.* at 298).

{¶33} The confidential informant testified that the messages received from Smith's Facebook account specified that he would be purchasing cocaine from Smith's uncle and that the buy would take place at Jackson Park. (*Id.* at 291-292). However, when the confidential informant arrived at Jackson Park to conduct the August 30, 2018 buy, it was Marques, rather than Smith's uncle, who appeared to

conduct the sale. (*Id.* at 296-297). The confidential informant testified that Marques was driving the same dark colored Cadillac, that no one else was in the vehicle with Marques, and that Marques was the one who sold him cocaine. (*Id.* at 296-297). The confidential informant stated that he was paid $50 for participating in the August 30, 2018 operation. (*Id.* at 298-299).

{¶34} On cross-examination, the confidential informant testified that he formerly used crack cocaine. (*Id.* at 308). However, he stated that he was not using drugs at the time of the controlled purchases, but he admitted that he was not subjected to drug testing. (*Id.* at 302-303, 306). He stated that he participated in the controlled purchases solely for financial reasons and that he earned over $1000 for all the operations in which he participated, including those not involving Smith. (*Id.* at 303, 307). The confidential informant also denied stealing covert funds. (*Id.* at 305).

{¶35} Furthermore, the confidential informant confirmed that he showed Detective Bell the Facebook messages used to plan the August 9 and August 30, 2018 controlled buys, but he acknowledged that no pictures were taken of those messages. (*Id.* at 307). He also testified that he never turned over his cell phone to Detective Bell. (*Id.* at 308). The confidential informant testified that Smith was not present at either the August 9 or the August 30, 2018 controlled buys and that children were present during the August 9, 2018 buy. (*Id.* at 309-310). He testified

that it was a "[p]ure guesstimate" that the children were 75 feet away from Marques's Cadillac when he entered the vehicle, and he conceded that it was possible that the children could have been more than 100 feet away. (*Id.* at 310). He also testified that a person "would have to be right up on [the Cadillac] to see into it." (*Id.*).

{¶36} On redirect examination, the confidential informant testified that the August 9, 2018 controlled purchase was "[i]n process" when he entered Marques's Cadillac. (*Id.* at 313). He testified that when he entered the Cadillac, he could see the children playing in Jackson Park and that it was fair to say that because he could see the children, the children could have seen him. (*Id.*).

{¶37} On recross-examination, the confidential informant testified that the children were "long behind" Marques's Cadillac when the drugs actually traded hands and that they would not physically have seen a drug transaction occurring. (*Id.* at 314).

{¶38} The State also offered the testimony of Detective Charles Boyer ("Detective Boyer") of the Tiffin Police Department, who was also a member of the Seneca County Drug Task Force. (*Id.* at 361). Detective Boyer testified that he conducted surveillance during the August 9, 2018 controlled purchase at Jackson Park and that he was stationed approximately 100 yards from the position of the confidential informant and Marques's Cadillac. (*Id.* at 367-369). He testified that

as the confidential informant was entering Marques's Cadillac, "[t]here was several juveniles in the area * * * probably about 75 feet away." (*Id.* at 368). Detective Boyer stated that he radioed Detective Bell with this information so that Detective Bell could include this information in his case notes. (*Id.* at 368-369). Detective Boyer also testified that he found the confidential informant to be reliable and trustworthy. (*Id.* at 375).

{¶39} On cross-examination, Detective Boyer testified that it was not possible that the children were more than 100 feet away from Marques's Cadillac when the confidential informant entered the vehicle. (*Id.* at 376). He stated that he "wouldn't have radioed to Detective Bell asking to place in [Detective Bell's] notes that the location of the juveniles were well within a hundred feet of the informant as [the confidential informant] was getting into the vehicle." (*Id.*). However, Detective Boyer testified that the 75-foot figure was "[j]ust an estimate." (*Id.*).

{¶40} Having reviewed the relevant portions of the record, we turn now to Smith's arguments that his convictions are against the manifest weight of the evidence. First, we consider Smith's argument that his convictions are against the manifest weight of the evidence because the evidence does not support a finding that he was the person who used the Facebook account registered in his name to send the messages that were used to arrange the drug sales. We note, as Smith does, that this argument is "especially critical with respect to Counts Three, Four, and

Five" because Smith "was charged with complicity to trafficking in cocaine, and not the trafficking offense itself." (Appellant's Brief at 9). As Smith implies, this argument has little, if any, bearing on Smith's convictions on Counts One and Two—which relate to the July 23, 2018 controlled purchase—because, even assuming that some other person used Smith's Facebook account to contact the confidential informant and arrange the July 23, 2018 controlled drug purchase, Detective Bell's and the confidential informant's uncontradicted testimonies and the video evidence overwhelmingly demonstrate that Smith personally sold the drugs to the confidential informant during the July 23, 2018 operation. Therefore, we consider this argument only in determining whether Smith's complicity-to-trafficking-in-cocaine convictions are against the manifest weight of the evidence.

{¶41} After reviewing the record, we cannot conclude that Smith's complicity-to-trafficking-in-cocaine convictions are against the manifest weight of the evidence. Contrary to Smith's argument, the record contains ample evidence from which the jury could have reasonably inferred that Smith, and not some other person, was the person who sent the Facebook messages organizing the drug sales. Both the confidential informant and Detective Bell testified that the Facebook messages, which contained language that, in Detective Bell's experience, was consistent with language often used to arrange drug deals, originated from a Facebook account bearing Smith's name. The confidential informant testified that

he always attempted to contact Smith by messaging the Facebook account registered in Smith's name. Furthermore, there is no evidence in the record suggesting that anyone other than Smith had access to Smith's Facebook account. The confidential informant stated that Smith and Marques did not share a Facebook account; when the confidential informant wanted to contact Marques, he would message Marques's Facebook account and when he wanted to contact Smith, he would message Smith's Facebook account. Thus, the greater weight of the evidence supports that Smith was the one who arranged the August 9, August 13, and August 30, 2018 transactions through his Facebook account, even though Marques was the only person present at the August 9 and August 30, 2018 controlled purchases.

{¶42} Moreover, with respect to Count Four, which relates to the August 13, 2018 controlled purchase, Smith was physically present when Marques sold the cocaine to the confidential informant. Smith drove Marques to Jackson Park to meet with the confidential informant, he was in the car with Marques and the confidential informant during the entire transaction, and, according to the confidential informant, Smith was fully aware that a drug sale was taking place. Coupled with the Facebook messages, Smith's presence at the August 13, 2018 controlled purchase is strongly corroborative of his complicity to Marques's trafficking in cocaine.

{¶43} Next, we consider Smith's argument that the evidence does not support a finding that Count Three, which relates to the August 9, 2018 controlled

purchase, was committed within the vicinity of a juvenile. Smith's argument is without merit. Detective Bell, Detective Boyer, and the confidential informant all testified that juveniles were approximately 75 feet away from Marques's black Cadillac when the confidential informant entered the Cadillac and commenced the controlled drug purchase. Although Detective Bell and the confidential informant testified that it was possible that the juveniles were more than 100 feet away at that time, Detective Boyer testified that he was certain that the juveniles were less than 100 feet away when the confidential informant entered the Cadillac. As the trier of fact, the jury was entitled to give decisive weight to Detective Boyer's testimony. Moreover, the jury's determination that the August 9, 2018 drug transaction occurred in the vicinity of a juvenile is not against the weight of the evidence just because Detective Bell, Detective Boyer, and the confidential informant offered only a visual estimate of the distance between the juveniles and the Cadillac instead of a precise measurement. *See State v. Howard*, 12th Dist. Warren No. CA2012-04-034, 2013-Ohio-1489, ¶ 69-70; *State v. Speers*, 11th Dist. Ashtabula No. 2003-A-0112, 2005-Ohio-4654, ¶ 34-35. Therefore, we conclude that the jury's finding that the August 9, 2018 controlled drug purchase was committed in the vicinity of a juvenile is not against the weight of the evidence.

{¶44} Finally, we consider Smith's argument that the jury should have discounted the confidential informant's testimony because the confidential

informant had a financial incentive to offer testimony favorable to the prosecution and because of the confidential informant's prior criminal history. Contrary to Smith's suggestion, the jury is not precluded from relying on a witness's testimony simply because the witness has a criminal history or a motivation to provide testimony favorable to the prosecution. *See State v. Nitsche*, 8th Dist. Cuyahoga No. 103174, 2016-Ohio-3170, ¶ 44. Instead, a witness's criminal history, prior drug use, or potential bias are factors that the jury may consider in determining whether to credit the witness's testimony and in assigning weight to the witness's testimony. *See State v. Price*, 3d Dist. Logan No. 8-13-03, 2013-Ohio-3984, ¶ 23-24. In this case, the jury was aware of the extent of the confidential informant's cooperation with law enforcement, his stated reasons for participating in the controlled drug purchases, and the amount of money he received for participating in these, and other, operations. Additionally, the jury heard testimony concerning the confidential informant's prior criminal history and his previous drug use. Smith's trial counsel was afforded an opportunity to cross-examine the confidential informant concerning these matters. Furthermore, the jury was able to consider Detective Bell's and Detective Boyer's testimonies that they found the confidential informant to be reliable and trustworthy. Ultimately, "[t]he decision whether, and to what extent, to believe the testimony of a particular witness is 'within the peculiar competence of the factfinder, who has seen and heard the witness.'" *Nitsche* at ¶

45, quoting *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 54. To the extent that the jury relied on the confidential informant's testimony to convict Smith, our review of the record has revealed nothing that would justify overturning the jury's decision to do so.

{¶45} Therefore, having weighed the evidence and all reasonable inferences, and considering the credibility of the witnesses, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Smith's trafficking-in-cocaine, trafficking-in-drugs, and complicity-to-trafficking-in-cocaine convictions must be reversed.

{¶46} Smith's first assignment of error is overruled.

### Assignment of Error No. II

**Because the testimony from Detective Brandon Bell of the Seneca County Drug Task Force referencing "previous dealings" with Appellant and Appellant's brother prejudiced Appellant and deprived Appellant of a fair trial, the trial court abused its discretion in denying Appellant's motion for a mistrial.**

{¶47} In his second assignment of error, Smith argues that the trial court abused its discretion by denying his motion for a mistrial. Specifically, Smith argues that the trial court should have declared a mistrial when Detective Bell testified that he was able to identify Smith because of "previous dealings" with Smith and Marques.

{¶48} "'A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected * * *.'" *State v. A.M.*, 8th Dist. Cuyahoga No. 106400, 2018-Ohio-4209, ¶ 23, quoting *State v. Reynolds*, 49 Ohio App.3d 27 (2d Dist.1988), paragraph two of the syllabus. "'Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible.'" *State v. Hansen*, 3d Dist. Seneca No. 13-12-42, 2013-Ohio-1735, ¶ 58, quoting *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "In determining whether a defendant was deprived of a fair trial, we must determine whether, absent the error or irregularity, 'the jury would have found the appellant guilty beyond a reasonable doubt.'" *State v. Junod*, 3d Dist. Mercer No. 10-18-08, 2019-Ohio-743, ¶ 44, quoting *State v. Morris*, 10th Dist. Franklin Nos. 18AP-208 and 18AP-209, 2018-Ohio-5252, ¶ 44, citing *State v. Maurer*, 15 Ohio St.3d 239, 267 (1984). "To determine whether the error resulted in prejudice, we must consider (1) the nature of the error, (2) whether an objection was made, (3) whether the trial court provided corrective instructions, and (4) the strength of the evidence against the defendant." *Id.*, citing *Morris* at ¶ 44.

{¶49} "Whether to grant a mistrial is within the sound discretion of the trial court." *Hansen* at ¶ 58, citing *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, ¶ 42, citing *State v. Glover*, 35 Ohio St.3d 18, 19 (1988). Thus, we review a trial

court's decision whether to grant a motion for a mistrial for an abuse of discretion. *Junod* at ¶ 43, citing *State v. Sage*, 31 Ohio St.3d 173, 182 (1987). An abuse of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

{¶50} Here, Smith argues that the trial court abused its discretion by denying his motion for a mistrial after Detective Bell testified that he was able to identify Smith because he had "previous dealings" with Smith and Marques. Detective Bell's reference to his "previous dealings" with Smith occurred during the following exchange:

[The State]: [Y]ou testified that [Smith] and Marques * * * were, in fact, twins. How is it that you were able to differentiate between the two?

[Detective Bell]: When these operations took place in July and August, Marques * * * had a longer hairdo. * * * I can tell the difference between their eyes. And at that time, * * * Smith had a very short, tight hair cut * * *. Marques * * * had a very bushy-type hairdo on top. It was quite long and curly, which was easy to compare the

-29-

photographs in those videos to determine which was which, even to someone who did not have previous knowledge of them. Based on the fact that I've worked in the City of Fostoria for ten and a half years, and about eight years prior to these operations, eight or nine years, *I had had previous dealings with these gentlemen * * *.*

(Emphasis added.) (May 6-8, 2019 Tr., Vol. II, at 204). Smith's trial counsel immediately objected to Detective Bell's reference to his "previous dealings" with Smith and Marques. (*Id.*). The trial court sustained Smith's trial counsel's objection and instructed the jury to "disregard the term previous dealings." (*Id.* at 205).

{¶51} Later, outside the presence of the jury, Smith's trial counsel moved for a mistrial. (*Id.* at 244). At this time, the trial court offered to give the jury a second curative instruction concerning Detective Bell's "previous dealings" comment, but the trial court stated that it was "afraid to bring it up again" and that "sometimes it's best not to bring up the items again and again." (*Id.* at 244-246). Ultimately, neither the State nor Smith's trial counsel requested that the trial court issue a second curative instruction. (*Id.* at 245-247). The trial court eventually denied Smith's motion for a mistrial. (*Id.* at 247).

{¶52} We conclude that the trial court did not abuse its discretion by denying Smith's motion for a mistrial. Smith argues that Detective Bell's "previous dealings" comment, when considered with the rest of his testimony, likely led the jury to conclude that the "previous dealings" he had with Smith and Marques were "drug-related, either as defendants or as confidential informants, and thus [Smith and Marques were] familiar with drug use and drug users themselves." (Appellant's Brief at 16-17). We question whether Detective Bell's ambiguous reference to "previous dealings" with Smith is the equivalent of a statement that Smith had connections to drug trafficking or that Smith had prior drug-related arrests or convictions. *See State v. Ford*, 8th Dist. Cuyahoga No. 106394, 2018-Ohio-5169, ¶ 47. Yet, even if we were to accept Smith's proposal that Detective Bell's reference suggested to the jury that Smith "had either used drugs, or had prior involvement with [Detective Bell] as a suspect or criminal defendant," Detective Bell's reference to his "previous dealings" with Smith did not warrant the granting of a mistrial because the reference was brief and immediately followed by an instruction to the jury to disregard the reference. Where an improper reference to a defendant's criminal history is "fleeting and * * * promptly followed by a curative instruction," the trial court does not abuse its discretion by denying the defendant's motion for a mistrial. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 174-175, quoting *State v. Garner*, 74 Ohio St.3d 49, 59 (1995); *A.M.*, 2018-Ohio-4209, at ¶ 25. Thus,

having sustained Smith's trial counsel's objection to Detective Bell's fleeting reference and having instructed the jury to disregard the comment, the trial court's decision to deny Smith's motion for a mistrial was not unreasonable, arbitrary, or unconscionable.

**{¶53}** Nevertheless, Smith argues that this case is distinguishable from other cases in which fleeting references to a defendant's criminal history did not require the granting of a mistrial because, in those cases, the references were to a defendant's relatively limited criminal history. He notes that in *Trimble*, the reference was to a "'prior conviction,' rather than the more nebulous phrase 'previous dealings,' which a jury could interpret to mean a more extensive criminal history than a single criminal conviction, or history of drug use." (Appellant's Brief at 15). *See Trimble* at ¶ 175. However, contrary to Smith's argument, where the reference to a defendant's criminal history was fleeting and quickly followed by a curative instruction, the extensiveness of the criminal history referred to has not been determinative of whether the trial court should have declared a mistrial. For example, in *Garner*, a witness improperly referred to "one of [the defendant's] arrests." (Emphasis deleted.) *Garner* at 59. Yet, despite implying a potentially lengthy history of criminal behavior, the Supreme Court of Ohio concluded that the reference did not require the trial court to order a mistrial because the reference was brief and promptly followed by a curative instruction. *Id.* In another case, the trial

court's refusal to declare a mistrial was upheld despite testimony that the defendant was "a repeat offender." *State v. Harris*, 10th Dist. Franklin No. 04AP-612, 2005-Ohio-4676, ¶ 26, 29. Therefore, it is immaterial that Detective Bell's reference could be interpreted as implying that Smith has an extensive criminal history.

{¶54} Smith also appears to argue that the single curative instruction given by the trial court was insufficient to neutralize the prejudice caused by Detective Bell's reference. (*See* Appellant's Brief at 15-16). Smith takes issue particularly with the trial court's reluctance to give a second curative instruction. (*Id.* at 16). His argument is without merit. The Supreme Court of Ohio has previously concluded that an instruction nearly identical to the one issued by the trial court in this case was adequate to eliminate the possibility of unfair prejudice. *See Trimble* at ¶ 166, 169-170, 175 (after sustaining an objection to a witness's reference to the defendant's "prior conviction," the trial court stated only that the "[j]ury is instructed to disregard"). Furthermore, although a second curative instruction was not given to the jury, we presume that the single curative instruction given by the trial court was effective. *See State v. Dodson*, 3d Dist. Seneca No. 13-10-47, 2012-Ohio-5576, ¶ 13 ("A jury is presumed to follow the curative instruction given by the trial court to disregard any evidence to which an objection is sustained."), citing *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 39. Moreover, by not issuing a second curative instruction, the trial court may have actually minimized the risk

that Smith would be prejudiced by Detective Bell's "previous dealings" comment. *See State v. Hester*, 10th Dist. Franklin No. 02AP-401, 2002-Ohio-6966, ¶ 15 (noting, in the context of an ineffective assistance of counsel argument, that "[c]ounsel may have declined to request a limiting instruction regarding appellant's prior convictions out of concern that, if such an instruction were given, the prior convictions would be once again called to the jury's attention").

**{¶55}** Finally, there is little likelihood that Smith was prejudiced by Detective Bell's "previous dealings" reference because, as discussed in our analysis of Smith's first assignment of error, there was ample evidence establishing Smith's guilt in this case. *See Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, at ¶ 175, citing *State v. Treesh*, 90 Ohio St.3d 460, 483 (2001). Accordingly, we conclude that the trial court did not abuse its discretion by denying Smith's motion for a mistrial.

**{¶56}** Smith's second assignment of error is overruled.

### Assignment of Error No. III

**Because the record, as shown by clear and convincing evidence, does not support the trial court's findings under R.C. 2929.14(C)(4), pursuant to R.C. 2953.08(G)(2), the trial court's sentence of Appellant in case number 2018 CR 0282 was not supported by the record.**

**{¶57}** In his third assignment of error, Smith argues that the trial court erred by deciding to impose consecutive sentences for Counts One, Two, and Three. Specifically, Smith argues that the consecutive sentences are "disproportionate to

the seriousness of [his] conduct and to the danger [he] pose[s] to the public." (Appellant's Brief at 19). Smith notes that he "showed genuine remorse for the offense" and that "none of the charges were higher than a fourth-degree felony." (*Id.*). Smith also observes that the drug transactions "took place inside a vehicle, out of the immediate view of children or those nearby" and that the drug purchases "were as part of a police operation, and no controlled substances reached the general public." (*Id.*).

{¶58} Under R.C. 2953.08(G)(2), an appellate court will reverse a sentence "only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. Clear and convincing evidence is that "'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Id.* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶59} In this case, Smith does not challenge the length of any of the sentences imposed for Counts One through Five. Instead, Smith challenges only the trial court's determination that the sentences for Counts One, Two, and Three should be served consecutively. Accordingly, we limit our review to a consideration

of whether the trial court made the necessary findings prior to imposing consecutive sentences and whether those findings are supported by the record.

{¶60} "Except as provided in * * * [R.C. 2929.14(C)], * * * a prison term, jail term, or sentence of imprisonment shall be served concurrently with any other prison term, jail term, or sentence of imprisonment imposed by a court of this state, another state, or the United States." R.C. 2929.41(A). R.C. 2929.14(C) provides, in relevant part:

(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to [R.C. 2929.16, 2929.17, or 2929.18], or was under post-release control for a prior offense.

(b)    At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c)    The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).  "R.C. 2929.14(C)(4) requires a trial court to make specific findings on the record before imposing consecutive sentences." *State v. Nienberg*, 3d Dist. Putnam Nos. 12-16-15 and 12-16-16, 2017-Ohio-2920, ¶ 17, citing *State v. Hites*, 3d Dist. Hardin No. 6-11-07, 2012-Ohio-1892, ¶ 11 and *State v. Peddicord*, 3d Dist. Henry No. 7-12-24, 2013-Ohio-3398, ¶ 33.  "Specifically, the trial court must find:  (1) consecutive sentences are necessary to either protect the public or punish the offender; (2) the sentences would not be disproportionate to the offense committed; and (3) one of the factors in R.C. 2929.14(C)(4)(a), (b), or (c) applies." *Id.*, citing *Hites* at ¶ 11 and *Peddicord* at ¶ 33.

{¶61} When imposing consecutive sentences, the trial court must make the findings required by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate

those findings into its sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 29, 37. In complying with this requirement, the trial court "has no obligation to state reasons to support its findings." *Id.* at ¶ 37. "[P]rovided that the necessary findings can be found in the record and are incorporated into the sentencing entry," a trial court need not recite a "talismanic incantation" of the language of R.C. 2929.14(C)(4) to properly impose consecutive sentences. *Id.*

{¶62} At the sentencing hearing in this case, the trial court made the following findings before imposing consecutive sentences:

The Court further finds that consecutive sentences are necessary to protect the public from future crime or to punish [Smith], and that consecutive sentences are not disproportionate to the seriousness of [Smith's] conduct, [and] to the danger [Smith] poses to the public. The Court further finds that at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of [Smith's] conduct. The Court further finds [Smith's] history of criminal conduct demonstrates that consecutive

> sentences are necessary to protect the public from future crime by [Smith].

(June 24, 2019 Tr. at 22-23). The trial court incorporated its consecutive-sentencing findings nearly verbatim in its judgment entry of sentence. (Doc. No. 33). Thus, it is clear that the trial court made the appropriate R.C. 2929.14(C)(4) findings prior to imposing consecutive sentences and that the trial court incorporated those findings into its sentencing entry.

{¶63} Moreover, it is equally clear that the trial court's consecutive-sentencing findings are supported by the record. While Smith argues that he expressed genuine remorse for his crimes and that this expression of remorse indicates that he is not a danger to the public, this does not account for the rest of the facts of Smith's case. Even if the trial court assigned significant weight to Smith's expression of remorse, Smith's persistent pattern of criminal conduct and the particular nature of the offenses in this case support the trial court's decision to impose consecutive sentences. Although the most severe offense of which Smith was convicted in this case was only a fourth-degree felony, Smith has a record of prior convictions, including felony convictions. The record reflects that at the time of the commission of the offenses in this case, Smith was on community control after having been convicted of obstruction, failure to comply, a third-degree felony, and trafficking in cocaine. (*See* Dec. 14, 2018 Tr. at 3); (Dec. 19, 2018 Tr. at 5);

(June 24, 2019 Tr. at 8-9). Thus, the record establishes that less-severe sanctions have not been able to fully protect the public from Smith's crimes. Moreover, as discussed above, the evidence demonstrated that one of the drug sales coordinated by Smith occurred at a public park within the vicinity of juveniles. *See State v. Williams*, 3d Dist. Seneca Nos. 13-19-23, 13-19-24, and 13-19-25, 2019-Ohio-5296, ¶ 20 (consecutive sentences supported in part by the fact that one of the offenses involved a drug sale that occurred in the vicinity of a juvenile). While Smith contends that the juveniles were unable to actually observe the drug transaction and that no drugs entered the community, we are not persuaded. While no drugs entered the community as a result of the four controlled purchase operations and juveniles may not have actually seen the August 9, 2018 transaction, by personally selling cocaine and alprazolam pills to the confidential informant and by coordinating a drug transaction that took place in a public park, Smith demonstrated a willingness to introduce harmful, addictive substances into his community and expose members of the public, including children, to the dangers inherent in drug trafficking. This is more than sufficient to support the trial court's finding that consecutive sentences are proportionate to the danger Smith poses to the public.

{¶64} In sum, the trial court made the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences and incorporated those findings into its sentencing entry. In addition, the trial court's R.C. 2929.14(C)(4)

findings are supported by the record. Therefore, we conclude that there is not clear and convincing evidence that Smith's consecutive sentences are unsupported by the record or otherwise contrary to law. *See Nienberg*, 2017-Ohio-2920, at ¶ 23.

**{¶65}** Smith's third assignment of error is overruled.

**{¶66}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**