[Cite as *State v. Kammeyer*, 2020-Ohio-3842.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,          CASE NO. 13-19-48

    v.

DAVID S. KAMMEYER,          O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 19 CR 0122

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:   July 27, 2020**

APPEARANCES:

    *Brian A. Smith* **for Appellant**

    *Rebeka Beresh* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, David S. Kammeyer ("Kammeyer"), appeals the November 25, 2019 judgment of sentence of the Seneca County Court of Common Pleas. For the reasons that follow, we affirm in part and reverse in part.

{¶2} This case stems from four controlled drug purchase operations conducted in Fostoria, Ohio in July and November 2018. On July 3 and July 5, 2018, a confidential informant allegedly purchased small quantities of crack cocaine from Kammeyer. Then, on November 19 and November 27, 2018, a different confidential informant allegedly purchased additional small quantities of crack cocaine from Kammeyer.

{¶3} On June 19, 2019, the Seneca County Grand Jury indicted Kammeyer on four counts of trafficking in cocaine in violation of R.C. 2925.03(A)(1), (C)(4)(a), fifth-degree felonies. (Doc. No. 1). On July 3, 2019, Kammeyer appeared for arraignment and pleaded not guilty to the counts of the indictment. (Doc. No. 11).

{¶4} A jury trial commenced on November 18, 2019. On November 19, 2019, the jury found Kammeyer guilty of Counts One, Two, and Three. (Doc. Nos. 34, 35). However, the jury found Kammeyer not guilty of Count Four, which related to the November 27, 2018 controlled purchase operation. (Doc. Nos. 34, 35).

{¶5} A sentencing hearing was held on November 25, 2019. At the sentencing hearing, Kammeyer was sentenced to 12 months in prison on Count One, 12 months in prison on Count Two, and 12 months in prison on Count Three. (Doc. No. 37). The trial court ordered that the prison sentences for Counts One and Two be served concurrently to one another but that the prison sentence for Count Three be served consecutively to the concurrent sentences imposed for Counts One and Two. (*Id.*). Thus, Kammeyer was sentenced to an aggregate term of 24 months' imprisonment.

{¶6} On December 13, 2019, Kammeyer filed a notice of appeal.[1] (Doc. No. 43). He raises three assignments of error for our review. For the sake of clarity, we begin by addressing Kammeyer's second assignment of error, followed in order by his first and third assignments of error.

### Assignment of Error No. II

**Because the State did not properly authenticate the recordings as required under Evid.R. 901, the trial court erred in admitting the audio and video recordings of the alleged transaction charged in Count Three of the Indictment.**

{¶7} In his second assignment of error, Kammeyer argues that the trial court erred by admitting State's Exhibit 7, a disc containing a copy of the alleged

---

[1] Subsequent to the filing of his notice of appeal, Kammeyer's appeal was consolidated for purposes of briefing and argument with case number 13-19-49, an appeal from Seneca County Court of Common Pleas case number 19CR0123. Due to the nature of the arguments specific to case number 13-19-49, we elect to dispose of case number 13-19-49 via separate judgment.

recording of the November 19, 2018 controlled purchase operation, because the recording was not properly authenticated. Kammeyer contends that the recording was not properly authenticated because the confidential informant who wore the recording device during the operation did not appear at trial to testify that the recording accurately depicted the operation. (Appellant's Brief at 11-12). Kammeyer also maintains that the law enforcement officers who conducted the operation could not authenticate the recording because they lost sight of the confidential informant just before the purchase allegedly took place and did not observe the transaction. (*Id.* at 12).

{¶8} "We review a trial court's determination of authentication for an abuse of discretion." *State v. Moorer*, 9th Dist. Summit No. 27685, 2016-Ohio-7679, ¶ 6, citing *State v. Spy*, 9th Dist. Summit No. 27450, 2016-Ohio-2821, ¶ 14; *State v. McClellan*, 3d Dist. Allen No. 1-09-21, 2010-Ohio-314, ¶ 72. An abuse of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

{¶9} "'Before a trial court may admit evidence, Evid.R. 901 requires the proponent to identify or authenticate the evidence.'" *State v. Spencer*, 4th Dist. Pickaway No. 19CA6, 2019-Ohio-3800, ¶ 14, quoting *State v. Vermillion*, 4th Dist. Athens No. 15CA17, 2016-Ohio-1295, ¶ 13. Evid.R. 901(A) provides that "[t]he

requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "The 'threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity.'" *State v. Waver*, 12th Dist. Butler No. CA2015-08-155, 2016-Ohio-5092, ¶ 28, quoting *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 65, citing *State v. Easter*, 75 Ohio App.3d 22, 25 (4th Dist.1991). Rather, the proponent of the evidence need only demonstrate a ""reasonable likelihood" that the evidence is authentic.'" *Id.*, quoting *Freeze* at ¶ 65. "Either circumstantial evidence or direct evidence may be used to prove the authenticity of evidence." *Id.*, citing *Vermillion* at ¶ 14.

{¶10} "Photographic evidence, including videotapes, can be admitted under two theories." *State v. Thyot*, 1st Dist. Hamilton Nos. C-170178 and C-170179, 2018-Ohio-644, ¶ 19. "Under the pictorial-testimony theory, evidence is admissible 'when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on the witness' personal observation.'" *Id.*, quoting *Midland Steel Prod. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121, 129-130 (1991) and citing *State v. Hoffmeyer*, 9th Dist. Summit No. 27065, 2014-Ohio-3578, ¶ 19. "Under the silent-witness theory, photographic evidence is a 'silent witness,' which 'speaks for itself, and is substantive evidence of what it portrays independent of a

sponsoring witness.'" *Id.*, quoting *Midland Steel* at 129-130 and citing *State v. Maiolo*, 2d Dist. Clark No. 2015-CA-15, 2015-Ohio-4788, ¶ 11. "Under that theory, evidence is admissible 'upon a sufficient showing of the reliability of the process or system that produced the evidence.'" *Id.*, quoting *Midland Steel* at 130 and citing *Hoffmeyer* at ¶ 19.

{¶11} We conclude that the trial court did not abuse its discretion by admitting State's Exhibit 7 because while State's Exhibit 7 might not be admissible under the pictorial-testimony theory, it is admissible under the silent-witness theory of authentication. At trial, Detective Don Joseph ("Detective Joseph"), the lead investigator for the November 19, 2018 controlled purchase operation, testified that "[o]n each and every [controlled] buy [they] do," the confidential informant is equipped with transmitting or recording devices during the preoperational protocols and any recording made during the operation is downloaded and reviewed afterwards. (Nov. 18-19, 2019 Tr. at 255-256). He stated that the standard preoperational protocols were followed during the November 19, 2018 operation, which included fitting the confidential informant with an audio-video recording device. (*Id.* at 262, 264). Detective Joseph testified that he checked the recording device before placing it on the confidential informant and found it to be functioning properly. (*Id.* at 264-265). He testified that he did not listen to or view the recording in real time. (*Id.* at 280). According to Detective Joseph, after the operation had

concluded, the recording device was removed from the confidential informant during the post-operational protocols. (*Id.* at 267).

{¶12} Detective Joseph testified that after the operation, he was able to make a determination whether the audio-video recording device had successfully captured the operation. (*Id.* at 270). When asked what he did with the recording device after it was returned, he stated:

> We bring the devices back to the [Task Force] office. A lot of the devices are unique and have proprietary software. So we download those devices utilizing specialized cables and whatnot to an evidence computer. Once it's downloaded off that device we can make disks for the prosecution and defense copies of the recordings.

(*Id.*). Detective Joseph testified that the recording of the November 19, 2018 operation was eventually transferred onto a format that could be played in court. (*Id.*). He identified State's Exhibit 7 as a disc containing a true and accurate representation of the recording made during the November 19, 2018 operation. (*Id.* at 271-272). He stated that State's Exhibit 7 did not appear to have been tampered with and that the disc was made using the same method he routinely uses when making copies of operation recordings. (*Id.* at 271). Detective Joseph testified that he was able to identify Kammeyer as the individual depicted in State's Exhibit 7 and in State's Exhibit 13, which is a still image adapted from State's Exhibit 7. (*Id.*

at 272-273). In addition, another officer, Detective Brandon Bell ("Detective Bell"), testified that he was able to identify Kammeyer as the individual featured in State's Exhibit 7. (*Id.* at 177, 272).

{¶13} This testimony is sufficient to support a finding that State's Exhibit 7 is in fact a recording of the November 19, 2018 controlled purchase operation. In other cases, similar testimony was held to be sufficient to authenticate audio-video recordings because it established that the recordings were produced by reliable processes or systems. *See Waver*, 2016-Ohio-5092, at ¶ 37-38 (testimony about the procedures used when working with confidential informants and statements that those procedures were followed, that the recording device had features to prevent tampering, and that the device had been used 20-30 times were sufficient to authenticate the recordings); *State v. Munion*, 4th Dist. Scioto No. 12CA3520, 2013-Ohio-3776, ¶ 20-22 (testimony that a detective "follow[ed] a certain protocol when issuing video recorders to informants" and that the recording was a true and accurate copy "present[ed] the court with the 'process or system' that created the video" and supported its authenticity). *See also State v. Bell*, 3d Dist. Seneca No. 13-12-27, 2013-Ohio-1303, ¶ 37-38 (holding that a detective's testimony was sufficient to authenticate recordings where he identified the people on the recordings and testified that the recording devices were working properly, that he listened to the operation in real-time, that he created and reviewed the recordings, and that the

recordings were accurate and untampered with). In line with these cases, we believe that Detective Joseph's and Detective Bell's testimonies were sufficient to demonstrate a "reasonable likelihood" that State's Exhibit 7 is a copy of the recording of the November 19, 2018 controlled purchase operation. Therefore, in light of the low evidentiary threshold for authentication, we conclude that the trial court did not abuse its discretion by admitting State's Exhibit 7.

{¶14} Kammeyer's second assignment of error is overruled.

**Assignment of Error No. I**

**Because the jury lost its way and created a manifest miscarriage of justice in finding Appellant guilty of Trafficking in Cocaine, Appellant's convictions in case number 2019 CR 0122 were against the manifest weight of the evidence.**

{¶15} In his first assignment of error, Kammeyer argues that his trafficking-in-cocaine convictions are against the manifest weight of the evidence.

{¶16} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on

matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶17} Kammeyer was convicted of three counts of trafficking in cocaine. The offense of trafficking in cocaine is codified in R.C. 2925.03(A)(1), which provides that "[n]o person shall knowingly * * * sell or offer to sell a controlled substance or a controlled substance analog." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶18} At trial, Detective Bell was the State's first witness. He testified that as part of his duties with the Seneca County Drug Task Force ("Task Force"), he conducts controlled purchase operations. (Nov. 18-19, 2019 Tr. at 134). Detective Bell explained how controlled purchase operations are typically conducted. Detective Bell testified that when a controlled purchase operation is ready to proceed, the investigating officers meet with a confidential informant at a

predetermined location. (*Id.* at 139). At that time, the confidential informant is searched for contraband, provided with money to make the purchase, and fitted with recording devices. (*Id.* at 139-140). After completion of the preoperational protocols, the informant is then sent to make the purchase. (*Id.* at 140). Detective Bell testified that during the operation, law enforcement officers "conduct visual surveillance to the best of [their] ability" if the purchase is taking place in public. (*Id.* at 143).

{¶19} Detective Bell stated that after the purchase is completed, the investigating officers meet with the confidential informant, at which time the informant is searched, the recording devices are returned, and the informant turns over any drugs they purchased. (*Id.* at 140, 143). With respect to audio or video recordings of the buys, he stated that after the transaction, the recording devices are taken back to the Task Force's offices, where the recordings are downloaded to an evidence computer and eventually put into a playable format. (*Id.* at 143). Detective Bell testified that these preoperational and post-operational protocols are followed "[e]very time" a controlled purchase operation is conducted. (*Id.* at 141).

{¶20} Detective Bell then testified about the specific controlled purchase operations he conducted, beginning with the July 3, 2018 operation. According to Detective Bell, the confidential informant who was used during the July 3, 2018 operation first came to the attention of law enforcement officers when he contacted

them and "advised that some of the things that were going on out in the public in the drug world he was upset about * * *." (*Id.* at 148). Detective Bell stated that the July 3, 2018 operation began when the confidential informant contacted him and told him that he could purchase $80 of crack cocaine from Kammeyer. (*Id.* at 149-150). He testified that he met with the confidential informant prior to the operation and that the normal preoperational protocols were followed, including searching the confidential informant for contraband. (*Id.* at 149). Detective Bell stated that no contraband was found on the confidential informant's person during the preoperational search. (*Id.* at 150). He testified that, at that time, the informant was also given $80 to purchase the drugs and fitted with recording devices, which were found to be in working order prior to the operation. (*Id.* at 151).

{¶21} Detective Bell stated that, following completion of the preoperational protocols, the confidential informant was dropped off near the intended site of the purchase. (Nov. 18-19, 2019 Tr. at 151). He testified that he conducted visual surveillance on the informant during part of the operation, though a different investigator eventually took over surveillance once the informant walked closer to the intended site of the purchase. (*Id.* at 152). Detective Bell stated that after the purchase was completed, he met with the confidential informant, who turned over a bag containing suspected crack cocaine. (*Id.*). He identified State's Exhibit 1 as the suspected crack cocaine obtained through the July 3, 2018 controlled purchase

operation. (*Id.* at 154-155). Detective Bell testified that the confidential informant was then searched again and that no contraband was discovered. (*Id.* at 153). He stated that the confidential informant was paid $50 for his role in the operation. (*Id.* at 148).

{¶22} Furthermore, Detective Bell stated that the recording devices were recovered from the confidential informant and taken to the Task Force's office, where he was able to determine that the devices had functioned properly. (*Id.* at 154, 159). He testified that he downloaded the recording and reviewed it. (*Id.* at 154, 159). Detective Bell identified State's Exhibit 5 as a true and accurate copy of the recording made during the July 3, 2018 operation. (*Id.* at 160). He also identified State's Exhibit 9 as a still image adapted from the video recording of the July 3, 2018 operation. (*Id.* at 161-162). Detective Bell testified that Kammeyer is featured both in the video and in the still image. (*Id.* at 161-162).

{¶23} Detective Bell then testified about the July 5, 2018 controlled purchase operation. He stated that, like the July 3, 2018 operation, the July 5, 2018 operation began when the same confidential informant said that he could purchase crack cocaine from Kammeyer. (*Id.* at 162-163). According to Detective Bell, the same preoperational protocols were followed and no contraband was discovered on the confidential informant's person. (*Id.* at 163-165). He stated that the informant was once again given $80 to make the purchase and that he was equipped with a

recording device, which was found to be in working order prior to the operation. (*Id.* at 165-166).

{¶24} Detective Bell testified that the confidential informant was then dropped off near the intended location of the purchase and that the informant was surveilled until the informant entered a residence, where he remained for 2-3 minutes. (Nov. 18-19, 2019 Tr. at 166-167). He stated that once the informant emerged from the residence, the informant walked back to where he was dropped off and was picked up. (*Id.* at 167). Detective Bell testified that the confidential informant then turned over a bag containing suspected crack cocaine. (*Id.*). He identified State's Exhibit 2 as the suspected crack cocaine obtained through the July 5, 2018 operation. (*Id.* at 168). Detective Bell also stated that the confidential informant was searched again. (*Id.* at 167). He testified that the confidential informant was paid $50 for his participation in the July 5, 2018 operation. (*Id.* at 163).

{¶25} In addition, Detective Bell stated that the recording device used by the confidential informant was taken back to the Task Force's office and that he was able to determine that the device had successfully captured the operation. (*Id.* at 171-172). He testified that he downloaded the recording to the Task Force's evidence computer. (*Id.* at 172). Detective Bell identified State's Exhibit 6 as a true and accurate copy of the recording made during the July 5, 2018 operation, and

he identified State's Exhibits 10, 11, and 12 as still images adapted from that recording. (*Id.* at 172-175). Detective Bell testified that Kammeyer is depicted both in the video and in the still images. (*Id.* at 173-175).

{¶26} Finally, Detective Bell testified that he assisted with the November 19, 2018 controlled purchase operation, albeit in a limited fashion. He stated that he was not physically present during the operation, but that he assisted the operation by identifying Kammeyer as the person featured in the video recording made during the operation. (*Id.* at 177); (State's Ex. 7).

{¶27} On cross-examination, Detective Bell testified that preoperational searches of confidential informants are "something in between" a pat-down and a strip search. (Nov. 18-19, 2019 Tr. at 195). He testified that the search includes a search of the confidential informant's pockets, items on the informant's person that could conceal contraband, and the informant's garments. (*Id.* at 195-196). Detective Bell stated that female confidential informants are searched differently than male informants and that female informants are required to shake their brassieres to dislodge any concealed contraband. (*Id.* at 196). He stated that informants also shake their pant legs to dislodge contraband but that an informant's underwear is not thoroughly searched. (*Id.* at 196-197). Furthermore, he testified that there are procedures to ensure that confidential informants are not intoxicated when they are conducting controlled purchases but that they do not usually require

informants to submit to drug testing unless they have reason to believe that the informant is using drugs. (*Id.* at 197-198). Detective Bell testified that neither the male confidential informant who participated in the July 2018 operations nor the female confidential informant who participated in the November 2018 operations was required to submit to drug testing. (*Id.* at 198).

**{¶28}** Detective Bell testified that the female confidential informant used during the November 19, 2018 operation was his informant but that Detective Joseph was actually the one who employed her services during that operation. (*Id.* at 211). He stated that he first approached the female confidential informant while she was incarcerated in the Seneca County Jail and that he informed her that she could receive consideration for pending felony charges in exchange for her participation in controlled purchase operations. (*Id.* at 203-205). Detective Bell testified that the female confidential informant was required to complete a certain number of operations in order to receive consideration for her pending charges, and he recognized that the female informant thus had an incentive to successfully complete the requisite number of operations. (*Id.* at 208). He also stated that, on occasion, informants who participate in controlled purchase operations for consideration on criminal charges continue to assist in additional operations for monetary compensation after fulfilling their original obligations. (*Id.* at 212).

Finally, he acknowledged that the female confidential informant could not be located for trial and that she had an active warrant for her arrest. (*Id.* at 208).

{¶29} On redirect examination, Detective Bell testified that he does not require his confidential informants to submit to drug testing unless his personal observations lead him to conclude that an informant is using drugs or he receives credible information that an informant is using drugs. (*Id.* at 213). He stated that he never felt the need to drug test either of the confidential informants during the July and November 2018 operations. (*Id.*).

{¶30} The State's next witness was the confidential informant who participated in the July 3 and July 5, 2018 controlled purchase operations. The confidential informant testified that he first started working as a confidential informant through his nephew, a police officer, who contacted Detective Bell. (Nov. 18-19, 2019 Tr. at 218). He stated that he asked to work for the Task Force because he "had some personal issues going on and [he] wanted to see what [he] could do about it * * *." (*Id.*). The confidential informant stated that he was involved in numerous controlled purchase operations over a four-month period and that he was financially compensated for his work. (*Id.* at 218-219).

{¶31} The confidential informant testified that he had previously used drugs and that cocaine was his drug of choice. (*Id.* at 219). He testified that he was familiar with Kammeyer "[j]ust from buying drugs." (*Id.*). He stated that he would

see Kammeyer frequently but that their relationship was "[j]ust a drug dealer/addict relationship." (*Id.* at 220). He stated that, as of the time of trial, he last used drugs in April 2019. (*Id.* at 219). The confidential informant also acknowledged that he had two previous theft convictions. (*Id.*).

{¶32} The confidential informant then testified that he was paid $50 to participate in the controlled drug purchase operation on July 3, 2018. (*Id.* at 220, 227). He stated that he arranged to purchase $80 of crack cocaine from Kammeyer. (*Id.* at 221). He testified that before meeting with Kammeyer, he met with Detective Bell, who searched him, fitted him with a recording device, and gave him $80 to complete the purchase. (*Id.* at 222-223). The confidential informant testified that no contraband was found on his person during the preoperational search. (*Id.* at 222).

{¶33} The confidential informant stated that he then met with Kammeyer. He testified that he gave Kammeyer $80 and that Kammeyer handed him a bag that appeared to contain crack cocaine. (Nov. 18-19, 2019 Tr. at 225). The confidential informant identified State's Exhibit 1 as the suspected crack cocaine he obtained from Kammeyer during the July 3, 2018 operation. (*Id.* at 228). He stated that no one else was present when the suspected drugs and money traded hands. (*Id.* at 225). He testified that after the purchase, he walked back to meet with Detective Bell and did not have contact with anyone else until he met with Detective Bell. (*Id.*

at 226). The confidential informant stated that he gave Detective Bell the suspected crack cocaine when they met and that no contraband was found on his person during the post-operational search. (*Id.*). He also testified that the recording device was returned to Detective Bell after the operation was completed. (*Id.* at 223, 226). The confidential informant stated that he viewed the recording of the July 3, 2018 operation and that State's Exhibit 5 is a fair and accurate representation of the operation. (*Id.* at 223-224). The confidential informant also examined State's Exhibit 9 and stated that Kammeyer was depicted in the still image and that Kammeyer sold him apparent crack cocaine during that interaction. (*Id.* at 227).

{¶34} Next, the confidential informant testified that he was paid $50 to take part in the July 5, 2018 controlled purchase operation. (*Id.* at 229, 234). He stated that, like the July 3, 2018 purchase, he arranged to buy $80 of crack cocaine from Kammeyer. (*Id.* at 229). He testified that he met with Detective Bell before the operation and that he was again searched for contraband, fitted with a recording device, and given $80 to complete the purchase. (*Id.* at 230-231). The confidential informant stated that no contraband was found on him during the preoperational search. (*Id.* at 230).

{¶35} The confidential informant testified that he then met with Kammeyer in a residence, where Kammeyer gave him what appeared to be crack cocaine in exchange for $80. (*Id.* at 233). He identified State's Exhibit 2 as the suspected

crack cocaine he obtained from Kammeyer during the July 5, 2018 operation. (*Id.* at 235-236). The confidential informant testified that he did not have contact with any other person after the purchase until he met with Detective Bell for the post-operational procedures. (*Id.* at 233-234). He stated that he turned over the suspected crack cocaine to Detective Bell and that he submitted to the post-operational search, which uncovered no contraband. (*Id.* at 234). He also testified that he returned the recording device to Detective Bell. (*Id.* at 231, 234).

{¶36} The confidential informant testified that he viewed the recording of the July 5, 2018 operation and that State's Exhibit 6 accurately reflects the operation. (Nov. 18-19, 2019 Tr. at 231-232). He also reviewed State's Exhibits 10, 11, and 12 and testified that Kammeyer is the person depicted in these still images. (*Id.* at 234-235). Finally, he reiterated that the person depicted in State's Exhibits 10, 11, and 12 was the man who sold him what appeared to be crack cocaine on July 5, 2018. (*Id.* at 235).

{¶37} On cross-examination, the confidential informant could not clearly articulate why he reached out to law enforcement officers to become a confidential informant. (*Id.* at 237-238). He stated that it was "just something [he] wanted to do" and it was his "own decision." (*Id.* at 237-238). He testified that he was a confidential informant for approximately four months in 2018 and that he

participated in over 20 operations. (*Id.* at 238). He stated that he received monetary compensation for all of the operations in which he participated. (*Id.*).

{¶38} In addition, he confirmed that crack cocaine was his drug of choice and that he relapsed in April 2019. (*Id.* at 239). However, he insisted that he was not using drugs at the time he worked as a confidential informant. (*Id.*). The confidential informant also discussed the preoperational searches to which he was subjected. He testified that Detective Bell would search his hat, pockets, socks, and shoes. (*Id.* at 239-240). The confidential informant stated that Detective Bell would also make sure that he was not concealing drugs in his mouth and that Detective Bell would shake out his shorts. (*Id.* at 239-240).

{¶39} With respect to the July 3, 2018 controlled purchase, the confidential informant acknowledged that the purchase was not actually captured by the recording device and that his discussion with Kammeyer during the purchase was inaudible due to a passing train. (Nov. 18-19, 2019 Tr. at 243). Yet, he testified that a purchase did in fact occur. (*Id.*). He also recognized that the recording of the July 5, 2018 purchase did not capture the actual purchase, but he again insisted that he did purchase what appeared to be drugs from Kammeyer. (*Id.* at 244-245).

{¶40} Following the confidential informant's testimony, Detective Joseph testified that he assisted Detective Bell during the July 3, 2018 controlled purchase operation. (*Id.* at 259). He stated that he was present during the preoperational and

post-operational protocols and that no contraband was discovered on the confidential informant's person during either search. (*Id.* at 259-260). Detective Joseph testified that during the operation itself, he conducted visual surveillance and observed an exchange between Kammeyer and the confidential informant. (*Id.* at 260).

{¶41} In addition, Detective Joseph testified that he was the lead investigator for the controlled purchase operation on November 19, 2018. (*Id.* at 261). He stated that Kammeyer was the target of the operation. (*Id.*). He testified that the female confidential informant was paid $25 for her role in the November 19, 2018 operation. (*Id.* at 261-262). Detective Joseph testified that the female confidential informant was searched for contraband prior to the operation and that no contraband was found on her person. (*Id.* at 264). Furthermore, he stated that the confidential informant was fitted with a recording device and that she was given $50 to purchase cocaine from Kammeyer. (*Id.*).

{¶42} Detective Joseph testified that once the operation was underway, he and Detective Charles Boyer ("Detective Boyer"), another member of the Task Force, conducted visual surveillance. (Nov. 18-19, 2019 Tr. at 265). He stated that they observed the confidential informant as she walked toward the predetermined purchase location, but that they lost sight of her for about two minutes when their view was obscured by a row of houses. (*Id.*). He testified that after those two

minutes, they saw the informant "com[ing] back the way she came" and heading toward their vehicle. (*Id.* at 266). Detective Joseph stated that immediately after the operation, the confidential informant turned over a bag containing suspected crack cocaine. (*Id.*). He identified State's Exhibit 3 as the suspected crack cocaine that the female confidential informant turned over following the November 19, 2018 operation. (*Id.* at 267-268). Detective Joseph stated that no contraband was found on the female confidential informant during the post-operational search. (*Id.* at 267). Finally, as discussed above, Detective Joseph identified State's Exhibit 7 as a true and accurate copy of the recording that was made by the female confidential informant's recording device during the November 19, 2018 operation. (*Id.* at 271-272). He was able to identify Kammeyer as the individual featured in State's Exhibit 7 and in State's Exhibit 13, a still image adapted from State's Exhibit 7. (*Id.* at 272-273).

{¶43} On cross-examination, Detective Joseph testified that the female confidential informant who participated in the November 19, 2018 operation was Detective Bell's informant, that he could not recall why Detective Bell was not present during the operation, and that he did not know why the female informant became an informant. (*Id.* at 274). Moreover, he stated that because they lost sight of the female confidential informant during the operation, they had to rely solely on the recording and her account of the circumstances of the purchase to determine

what happened during the operation. (*Id.* at 280). Detective Joseph testified that he did not witness a hand-to-hand transaction between the female confidential informant and Kammeyer. (*Id.*).

{¶44} In addition, Detective Joseph described how the female confidential informant was searched prior to the operation:

> We search out informants pretty much * * * the same. If it's a female,
> we search using the back of our hands and make sure another officer
> is present. If we have a suspicion that they may be containing
> contraband inside their brassiere, we will have them pull it out, shake
> it out for us. We search their pockets, their outer clothing. We have
> them take their shoes off. We have them open their mouth, lift up
> their tongue.

(*Id.* at 281). However, he acknowledged that females sometimes conceal contraband vaginally. (*Id.* at 278).

{¶45} On redirect examination, Detective Joseph testified that there was nothing indicating that the female confidential informant was hiding contraband on her person or that she was trying to retrieve concealed contraband during the two-minute period that she was out of view. (Nov. 18-19, 2019 Tr. at 286).

{¶46} The State's final witness was Detective Boyer. Detective Boyer testified that he participated in the July 5, 2018 controlled purchase operation. (*Id.*

at 293). He stated that he was present for the preoperational protocols and that no contraband was discovered on the confidential informant during the search. (*Id.*). He also testified that he assisted in fitting the confidential informant with the recording devices. (*Id.*). Detective Boyer testified that he conducted visual surveillance during the July 5, 2018 operation. (*Id.* at 294). He stated that he was also present for the post-operational protocols and that other than the suspected cocaine allegedly purchased from Kammeyer, no other contraband was found on the confidential informant's person. (*Id.* at 294-295).

{¶47} In addition, Detective Boyer testified that he assisted Detective Joseph during the November 19, 2018 operation. (*Id.* at 295). He stated that he helped with the preoperational search of the female confidential informant and that no contraband was found on the informant during the search. (*Id.* at 296-295). He testified that Detective Joseph was responsible for fitting the informant with the recording devices. (*Id.* at 296). Furthermore, he testified that he was present during the post-operational search and that the only item found on the female informant's person was the supposed crack cocaine she allegedly purchased from Kammeyer. (*Id.* at 297).

{¶48} On cross-examination, Detective Boyer testified that although he was conducting visual surveillance, he never saw Kammeyer during any of the

controlled purchase operations in which he participated. (Nov. 18-19, 2019 Tr. at 301).

{¶49} The State then moved to admit its exhibits and rested. State's Exhibits 14, 15, and 16, which consist of lab reports identifying the substances in State's Exhibits 1, 2, and 3 as cocaine, were admitted by stipulation. (*Id.* at 250-251, 304-305). Ultimately, all of the State's exhibits and Kammeyer's exhibits were admitted. (*Id.* at 304-305, 308-310). Kammeyer did not call any witnesses to testify on his behalf.

{¶50} Having reviewed the relevant portions of the record, we now turn to Kammeyer's arguments that his convictions are against the manifest weight of the evidence. We begin with Kammeyer's argument that his convictions for Counts One and Two, which relate to the July 3 and July 5, 2018 controlled purchase operations, are against the manifest weight of the evidence because the testimony of the confidential informant who participated in the July 2018 operations was not credible. Kammeyer contends that the confidential informant's testimony was not credible "due to his financial motive to cooperate with the police." (Appellant's Brief at 6-7). Moreover, he maintains that "[t]he jury should * * * have given less weight to [the confidential informant's] testimony because of his lack of candor and evasiveness about why he wanted to work as a confidential informant." (*Id.* at 7). Finally, Kammeyer argues that the jury should not have credited the confidential

informant's testimony because of his prior criminal history and history of drug abuse. (*Id.* at 7-8).

**{¶51}** Kammeyer's argument is without merit. "[T]he jury is not precluded from relying on a witness's testimony simply because the witness has a criminal history or a motivation to provide testimony favorable to the prosecution." *State v. Smith*, 3d Dist. Seneca No. 13-19-26, 2020-Ohio-427, ¶ 44, citing *State v. Nitsche*, 8th Dist. Cuyahoga No. 103174, 2016-Ohio-3170, ¶ 44. "Instead, a witness's criminal history, prior drug use, or potential bias are factors that the jury may consider in determining whether to credit the witness's testimony and in assigning weight to the witness's testimony." *Id.*, citing *State v. Price*, 3d Dist. Logan No. 8-13-03, 2013-Ohio-3984, ¶ 23-24. Here, the jury was aware that the confidential informant had participated in numerous controlled purchase operations and that he had been financially compensated for his cooperation in all of these operations, including the July 3 and July 5, 2018 operations. The jury was also aware of the confidential informant's stated reasons for participating in the controlled purchase operations, and it knew that the confidential informant had both a prior criminal history and a history of using crack cocaine, including a relapse in April 2019. Importantly, Kammeyer was afforded an opportunity to cross-examine the confidential informant concerning these matters. "Ultimately, '[t]he decision whether, and to what extent, to believe the testimony of a particular witness is

"within the peculiar competence of the factfinder, who has seen and heard the witness."'" *Id.*, quoting *Nitsche* at ¶ 45, quoting *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 54. To the extent that the jury relied on the confidential informant's testimony to convict Kammeyer of the charges stemming from the July 3 and July 5, 2018 operations, our review of the record has revealed nothing that would support second-guessing the jury's decision to do so.

{¶52} When the confidential informant's testimony is considered alongside all the other evidence presented at Kammeyer's trial, there is ample evidence supporting his convictions for Counts One and Two. The record reflects that the confidential informant was searched for drugs prior to conducting the July 3 and July 5, 2018 operations and that no drugs were found during either search. In both operations, the confidential informant left with $80 and returned with substances that were later found to contain cocaine. The confidential informant testified that, on both occasions, he purchased the substances from Kammeyer. During the July 3, 2018 operation, one of the investigating officers saw Kammeyer meeting with the confidential informant, and although there was testimony that Kammeyer was not seen by officers during the July 5, 2018 operation, this can be attributed to the fact that the July 5, 2018 purchase happened inside of a residence. Regardless, law enforcement officers and the confidential informant were able to identify Kammeyer as the person depicted in both of the recordings of the operations.

Furthermore, the confidential informant's testimony and the recordings both support that the informant did not have contact with anyone but Kammeyer from the time he left to meet with Kammeyer until the time he returned from the meeting. Accordingly, we conclude that Kammeyer's convictions for Counts One and Two are not against the manifest weight of the evidence.

{¶53} Additionally, Kammeyer argues that his conviction for Count Three, which relates to the November 19, 2018 controlled purchase operation, is against the manifest weight of the evidence because "[t]here was a critical lack of evidence and testimony surrounding the alleged third controlled buy." (Appellant's Brief at 9). First, Kammeyer repeats his argument that State's Exhibit 7 was not properly authenticated, and he contends that the jury should not have considered the recording when determining his guilt. (*Id.* at 9-10). In addition, he notes that the confidential informant who participated in the November 19, 2018 operation did not testify at trial and that she had a "clear" motivation to ensure that the operation yielded drugs. (*Id.* at 8-9). Kammeyer also suggests that some unexplained procedural irregularities during the November 19, 2018 operation, specifically that the investigating officers made a photocopy of $150 in covert funds when the officers "always knew that [the] transaction would be to purchase $50 worth of drugs," call into question the reliability of the other protocols followed during the operation. (*See id.* at 10). Finally, Kammeyer observes that the investigating

officers testified that they did not see him during the November 19, 2018 operation, that they did not see a hand-to-hand transaction in the recording of the operation, and that they did not listen to the recording in real time. (*Id.* at 9-10).

{¶54} Despite his arguments, we conclude that Kammeyer's conviction for Count Three is not against the manifest weight of the evidence. Initially, as discussed in our analysis of his second assignment of error, State's Exhibit 7 was properly authenticated. Thus, the jury could properly consider State's Exhibit 7 in determining whether Kammeyer sold cocaine to the confidential informant during the November 19, 2018 operation.

{¶55} Moreover, the jury was aware that the confidential informant had an incentive, whether monetary or legal, to successfully complete a drug transaction during the November 19, 2018 operation. Yet, the jury also heard testimony that no drugs were found on the confidential informant when she was searched prior to the operation, and Detective Joseph's testimony and State's Exhibit 7 both support that the confidential informant did not retrieve concealed drugs during the two-minute period that she was out of view of the officers conducting surveillance. Thus, this evidence refutes Kammeyer's implication that the confidential informant framed him by concealing drugs on her person and claiming that she purchased the drugs from Kammeyer.

{¶56} Furthermore, we do not believe that the discrepancy regarding the covert funds necessarily destroys confidence in the other protocols used during the November 19, 2018 operation. The jury knew that the inaccurate photocopy of the covert funds used during the November 19, 2018 operation was somewhat of a deviation from standard procedure. However, the jury was presented with evidence supporting that other operational protocols, specifically the preoperational and post-operational searches, were strictly followed. To the extent that the jury believed the testimony that the preoperational and post-operational protocols were otherwise followed to the letter, we find no error in its judgment.

{¶57} Although none of the testifying witnesses saw Kammeyer or the alleged purchase on November 19, 2018, and State's Exhibit 7 does not depict the alleged transaction, the evidence still weighs in favor of Kammeyer's conviction. The record reflects that no drugs were found on the confidential informant's person during the preoperational search. The record also establishes that when the confidential informant returned from the operation, she was in possession of a substance that was later found to contain cocaine. Multiple witnesses identified Kammeyer as the person who was depicted meeting with the confidential informant in State's Exhibit 7. Additionally, there is no evidence in the record supporting that the confidential informant received the drugs from a person other than Kammeyer while she was out of view of the officers conducting surveillance or that the

confidential informant brought the drugs to the meeting with Kammeyer. Therefore, we conclude that Kammeyer's conviction for Count Three is not against the manifest weight of the evidence.

{¶58} In conclusion, having weighed the evidence and all reasonable inferences, and considering the credibility of the witnesses, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Kammeyer's trafficking-in-cocaine convictions must be reversed.

{¶59} Kammeyer's first assignment of error is overruled.

**Assignment of Error No. III**

**Because the trial court did not make the required findings, under R.C. 2929.14(C)(4), to impose consecutive sentences, Appellant's sentence in case number 2019 CR 0122 was contrary to law.**

{¶60} In his third assignment of error, Kammeyer argues that the trial court erred by ordering that he serve his sentence for Count Three consecutively to the concurrent sentences imposed for Counts One and Two. Specifically, Kammeyer argues that his consecutive sentences are contrary to law because the trial court failed to make all of the findings required by R.C. 2929.14(C)(4) at the sentencing hearing and in its judgment entry of sentence.

{¶61} Under R.C. 2953.08(G)(2), an appellate court will reverse a sentence "only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is

otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. Clear and convincing evidence is that "'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Id.* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶62} In this case, Kammeyer does not challenge the length of any of the sentences imposed for Counts One through Three. Instead, Kammeyer challenges only the trial court's determination that the sentence for Count Three should be served consecutively to the concurrent sentences imposed for Counts One and Two. Accordingly, we limit our review to a consideration of whether the trial court made the necessary findings prior to imposing consecutive sentences and whether those findings are supported by the record.

{¶63} "Except as provided in * * * [R.C. 2929.14(C)], * * * a prison term, jail term, or sentence of imprisonment shall be served concurrently with any other prison term, jail term, or sentence of imprisonment imposed by a court of this state, another state, or the United States." R.C. 2929.41(A). R.C. 2929.14(C) provides, in relevant part:

> (4) If multiple prison terms are imposed on an offender for convictions
> of multiple offenses, the court may require the offender to serve the
> prison terms consecutively if the court finds that the consecutive

-33-

service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to [R.C. 2929.16, 2929.17, or 2929.18], or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4). "R.C. 2929.14(C)(4) requires a trial court to make specific findings on the record before imposing consecutive sentences." *State v. Nienberg*,

3d Dist. Putnam Nos. 12-16-15 and 12-16-16, 2017-Ohio-2920, ¶ 17, citing *State v. Hites*, 3d Dist. Hardin No. 6-11-07, 2012-Ohio-1892, ¶ 11 and *State v. Peddicord*, 3d Dist. Henry No. 7-12-24, 2013-Ohio-3398, ¶ 33. "Specifically, the trial court must find: (1) consecutive sentences are necessary to either protect the public or punish the offender; (2) the sentences would not be disproportionate to the offense committed; and (3) one of the factors in R.C. 2929.14(C)(4)(a), (b), or (c) applies." *Id.*, citing *Hites* at ¶ 11 and *Peddicord* at ¶ 33.

{¶64} When imposing consecutive sentences, the trial court must make the findings required by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate those findings into its sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 29, 37. In complying with this requirement, the trial court "has no obligation to state reasons to support its findings." *Id.* at ¶ 37. "[P]rovided that the necessary findings can be found in the record and are incorporated into the sentencing entry," a trial court need not recite a "talismanic incantation" of the language of R.C. 2929.14(C)(4) to properly impose consecutive sentences. *Id.*

{¶65} At the sentencing hearing, the trial court made the following statements regarding Kammeyer's sentences:

I have certainly considered the principles and purposes of sentencing under [R.C.] 2929.11. I've balanced the seriousness and recidivism

factors under 2929.12, and the guidance afforded to the Court under [R.C.] 2929.13[(B)].

* * *

The Court further finds pursuant to [R.C.] 2929.13(B)(2) that [Kammeyer] has previous prison term served and is therefore not amenable to community control and that prison is consistent with the purposes of [R.C.] 2929.11.

It is therefore ordered, adjudged, and decreed * * * [that Kammeyer] is sentenced as to Count One to serve 12 months in prison, as to Count Two he is sentenced to serve 12 months in prison, [and] as to Count Three he is sentenced to serve 12 months in prison.

* * *

It is the specific order of this Court that the sentences that I have imposed * * * [for] Count One and Two be served concurrently with each other. However, it is the specific order of this Court that Count Three be served consecutively to those two sentences. * * *

This Court finds that [Kammeyer's] criminal history requires consecutive sentences and that the harm caused was * * * great or unusual.

(Nov. 25, 2019 Tr. at 9-11).

{¶66} Based on our review of the record, we cannot conclude that the trial court complied with its obligation to make all of the required R.C. 2929.14(C)(4) findings at the sentencing hearing. In finding that Kammeyer's criminal history calls for consecutive sentences and that the harm Kammeyer caused was great or unusual, the trial court made, or at least attempted to make, findings under R.C. 2929.14(C)(4)(b) and (c). However, the trial court did not make any findings at the sentencing hearing that consecutive sentences are "necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public."

{¶67} Nevertheless, the State argues that the trial court's references to R.C. 2929.11, 2929.12, and 2929.13 implied that "it had addressed the first portion of [R.C.] 2929.14(C)(4) * * *." (Appellee's Brief at 16). We cannot accept the State's argument. Forcing a defendant to infer that the trial court made all of the required R.C. 2929.14(C)(4) findings ill serves what is perhaps the principal purpose of the requirement that trial courts state their consecutive-sentencing findings on the record at the sentencing hearing—providing notice to the defendant and to defense counsel. *See Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, at ¶ 29, citing Crim.R. 32(A)(4). Furthermore, we question whether the trial court's references to R.C. 2929.11 and to the other sentencing statutes actually support an inference that the

trial court addressed the first portion of R.C. 2929.14(C)(4). In a previous case, this court concluded that, "given the similarities between the language of R.C. 2929.11(A) and that of R.C. 2929.14(C)(4)," a trial court's statement that "consecutive sentences were necessary to fulfill the purposes of R.C. 2929.11" was sufficient to fulfill its obligations under R.C. 2929.14(C)(4) because we could "discern that the trial court considered the purposes of R.C. 2929.11—the need 'to protect the public' or 'to punish the offender'—for purposes of R.C. 2929.14(C)(4)." *State v. Crowe*, 3d Dist. Seneca No. 13-19-16, 2019-Ohio-5300, ¶ 12. In this case, however, the trial court's references to R.C. 2929.11, 2929.12, and 2929.13 are ambiguous—these references could refer to the trial court's determination of the appropriate length of the individual sentences imposed for Counts One through Three, to its decision to impose consecutive sentences, or to both. *Compare id.* ("[T]he trial court first considered the principles and purposes of felony sentencing under R.C. 2929.11 prior to imposing Crowe's sentence. Then, in its consecutive-sentence analysis, the trial court again referenced the purposes of R.C. 2929.11 in its consecutive-sentence imposition."). Therefore, on this record, we are unable to conclude that the trial court fulfilled its obligations under R.C. 2929.14(C)(4) by citing to these other sentencing statutes.

{¶68} Finally, the State notes that in the trial court's judgment entry of sentence, it found that "[c]onsecutive sentences [are] necessary to fulfill the

purposes of [R.C.] 2929.11, and not disproportionate to the seriousness of the defendant's conduct or the danger the defendant poses" and that "the harm caused was great or unusual." The State contends that this indicates that the trial court considered R.C. 2929.14(C)(4) and made all of the required findings. (Appellee's Brief at 16-17). However, even assuming that the trial court made all of the required R.C. 2929.14(C)(4) findings in its judgment entry of sentence, it makes no difference; the trial court must make all of the required findings both at the sentencing hearing and in its judgment entry of sentence. *State v. Brown*, 7th Dist. Mahoning No. 15 JE 0014, 2016-Ohio-5701, ¶ 19 ("[T]he court did put the necessary findings in the judgment entry of sentence. But the court must make the findings at the sentencing hearing, not simply in the judgment entry.").

{¶69} Accordingly, because the trial court did not make all of the required R.C. 2929.14(C)(4) findings at Kammeyer's sentencing hearing, "'the imposition of consecutive sentences in this case is contrary to law.'" *State v. Payne*, 3d Dist. Henry No. 7-19-02, 2019-Ohio-2852, ¶ 6, quoting *Bonnell* at ¶ 37. As a result, we reverse the judgment of the trial court, vacate Kammeyer's sentence, and remand the matter to the trial court for resentencing. *Id.*; *Brown* at ¶ 21.

{¶70} Kammeyer's third assignment of error is sustained.

{¶71} Having found no error prejudicial to the appellant herein in the particulars assigned and argued with respect to his first and second assignments of

error, we affirm the judgment of the trial court with respect to those matters. However, having found error prejudicial to the appellant herein in the particulars assigned and argued with respect to his third assignment of error, we reverse the judgment of the trial court with respect to that matter and remand to the trial court for resentencing consistent with this opinion.

***Judgment Affirmed in Part,***
***Reversed in Part and***
***Cause Remanded***

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**