[Cite as *State v. Handshoe*, 2023-Ohio-3205.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 1-22-54

    v.

JON HANDSHOE,                        O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Allen County Common Pleas Court
Trial Court No. CR 2020 0170

**Judgment Affirmed**

Date of Decision: September 11, 2023


APPEARANCES:

    *William T. Cramer* for Appellant

    *John R. Willamowski, Jr.* for Appellee

**POWELL, J.**

{¶1} Defendant-appellant, Jon Handshoe ("Handshoe"), appeals the August 25, 2022 judgment of conviction and sentence entered against him in the Allen County Court of Common Pleas, following a jury trial in which Handshoe was found guilty of burglary. For the reasons that follow, we affirm.

*Procedural History*

{¶2} This case originated on August 13, 2020, when the Allen County grand jury returned a single-count indictment charging Handshoe with burglary, a second-degree felony in violation of R.C. 2911.12(A)(2). On August 31, 2020, an arraignment was held and Handshoe entered a plea of not guilty. Over 22 months of pretrial proceedings then ensued.

{¶3} On July 11, 2022, a jury trial commenced in the case. Immediately prior to the start of trial, the state amended the indictment to charge the lesser-included offense of burglary in violation of R.C. 2911.12(A)(3), a third-degree felony. During the course of the two-day trial, the prosecution presented the testimony of four witnesses and introduced numerous exhibits.

{¶4} On July 12, 2022, the jury returned a verdict finding defendant guilty as charged in the amended indictment. The trial court accepted the verdict, discharged the jury, and ordered a presentence investigation.

Case No. 1-22-54

{¶5} On August 24, 2022, a sentencing hearing was held and Handshoe was sentenced to 24 months in prison.

{¶6} On September 22, 2022, Handshoe filed the instant appeal, in which he raises two assignments of error for our review.

**First Assignment of Error**

**Appellant's rights to due process under the state and federal constitutions were violated by the improper admission of other acts evidence that appellant was abusive and threatening toward an alleged accomplice.**

**Second Assignment of Error**

**Appellant's due process rights under the state and federal constitution [*sic*] were violated by the improper admission of a duplicate of a duplicate of portions of video surveillance purporting to show the burglary in process.**

*Summary of Evidence Presented at Trial*

{¶7} Michael Neal, the victim in this case, testified that in June of 2020 he was living at 619 Ohio Street in Lima, Allen County, Ohio. Neal owned that residence and had lived there for more than five years. Over the weekend of June 27th and 28th of that year, Neal engaged in sexual relations at his home with a prostitute named Ronda Volbert, along with another sex worker who was a friend of Volbert's. Neal paid the women $80.00 for that transaction. Neal had known Volbert, and had utilized her professional services, for several years. Through his relationship with Volbert, Neal had also become acquainted with Jon Handshoe, the

-3-

defendant-appellant, who was Volbert's boyfriend and who also arranged and controlled Volbert's prostitution services. When Volbert and her friend visited Neal's home on the weekend of June 27, 2020, Handshoe came over to Neal's residence along with the women. Handshoe did not enter Neal's home but, rather, stayed outside on the sidewalk.

{¶8} On Monday, June 29, 2020, Neal was at work from 7:00 a.m. until 3:00 p.m., which was his typical work schedule every Monday through Friday. On the afternoon of June 29th, when Neal arrived home from work, he found that his house had been forcibly entered and ransacked. Neal determined that his back door had been forced open and that numerous items had been stolen, including pocket knives, jewelry, a small floor safe, and the contents of the safe which included approximately $500.00 in cash, blank checks, and Neal's birth certificate and passport. Neal called the police and reported the burglary.

{¶9} While waiting for the police to arrive, Neal walked next door to his brother's house and asked his brother to check his home's security cameras for video that might show the intruder or intruders. Neal's brother was able to find video of the incident but was unable to download the video from his surveillance system in order to copy the video to give to the police. So Neal then used his cellphone to record a portion of the video as it played on his brother's monitor. When watching the video, Neal noted that one portion showed two persons leaving the back of his

house. Neal recognized the woman in that portion of the video to be Ronda Volbert. A subsequent segment of the video depicted two men in the alley by Neal's house, and Neal thought that one of those men was Handshoe.

{¶10} Lima Police Department Patrolman Brandon Stephenson testified that he was the initial officer dispatched to 619 Ohio Street in response to Michael Neal reporting the burglary. Upon arrival, Stephenson noted the disarray in Neal's home, along with damage to the property where entry had been made by the perpetrators, and Stephenson called for another police unit to respond in order to photograph the scene. Neal told the officer about the various items that were missing. Neal also informed Stephenson that Neal's brother next door had security cameras that had captured some video of the burglary in progress, and Neal showed the officer the video Neal had recorded on his cellphone. While doing so, Stephenson's body camera recorded a video of Neal playing the video on his phone for Stephenson. Neal and Stephenson then went next door and also watched the video on Neal's brother's monitor; however, the brother was unable to actually download the original video in order for it to be copied. Nonetheless, based on Stephenson's prior knowledge of Jon Handshoe, along with information provided by the victim, Stephenson determined that Handshoe was one of the persons depicted on the video of the burglary.

{¶11} Detective Matt Boss of the Lima Police Department testified that he was assigned to conduct follow-up investigation on the burglary report. He was assigned the case the day after the burglary occurred. Upon learning that Ronda Volbert had been identified in the video and that one of the men in the video was thought to be Handshoe, Boss obtained an address for Volbert and Handshoe, which was 512 West Kibby Street. The detective went to that residence but got no answer when he knocked on the door. As Boss was leaving the house at 512 West Kibby, he spoke with some neighbors who confirmed that Volbert and Handshoe both lived at that address. Detective Boss then obtained a search warrant for the residence at 512 West Kibby. Upon executing the search warrant later that day, police found both Handshoe and Volbert in the house on Kibby Street and placed them under arrest. Handshoe was searched incident to that arrest and one of the knives stolen from Michael Neal's house in the burglary was found in Handshoe's pocket. When the police searched the house, several pieces of jewelry stolen in the burglary were located in a bedroom dresser filled with male clothing, and two pocket knives stolen from Neal were also found in the house. Detective Boss subsequently interviewed Ronda Volbert, who gave conflicting statements about the burglary. Boss was also able to identify the other man shown in the video of the burglary as being Jordan Nichols. Nichols was arrested shortly thereafter, and additional items stolen in the burglary were found in Nichols' possession.

{¶12} Ronda Volbert was charged with the burglary of Neal's home and subsequently pled guilty to that crime. Volbert then testified at trial for the prosecution in the instant case. Volbert testified that she and Handshoe had been girlfriend and boyfriend for approximately 14 years and, in June of 2020, the two of them were living together at 512 West Kibby Street in Lima. Volbert worked as a prostitute. Handshoe typically took charge of setting up engagements with Volbert's sex clients and then he would walk her to and from such engagements, after which Volbert would turn over the money she made to Handshoe.

{¶13} As of June of 2020, Volbert had known Michael Neal for several years, after meeting him while she was working as a prostitute and he engaged her services. After that initial meeting, they continued to see each other in that same capacity on an ongoing basis.

{¶14} On the weekend of June 28, 2020, Volbert and another female met up with Neal, who then paid the women for sex. Afterwards, Volbert gave Handshoe the money she had made but Handshoe accused Volbert of shorting him on the proceeds. Handshoe threatened Volbert, telling her he would hurt her grandchildren, and then he told Volbert that she had to go back to Neal's house, break in, and get more money. Handshoe and Volbert then went to her cousin's house and her cousin, Jordan Nichols, agreed to assist Volbert in the break-in. Volbert went along with the plan because she was afraid Handshoe would beat her

if she did not, because that is what he would do when Volbert did not comply with Handshoe's demands.

{¶15} On June 29, 2020, Volbert and Nichols walked over to Neal's house on Ohio Street, which was just two blocks from where Volbert and Handshoe lived on Kibby Street. Handshoe followed behind them as they walked to Neal's home. When they got to Neal's house, Volbert and Nichols went around the side of the house, where Nichols jumped the fence and unlocked the gate. Nichols then kicked in the back door to Neal's home and Nichols and Volbert entered the residence. As the two were going inside, Handshoe was walking past the house in the alley. Once inside, Nichols began rummaging through things while Volbert grabbed some marijuana and ran back to the door. The two ultimately left Neal's house together and went back to Volbert and Handshoe's house on Kibby Street, where Handshoe was waiting.

{¶16} Volbert gave the stolen marijuana to Handshoe and Nichols. Nichols pulled a quantity of jewelry out of his pockets and then mentioned that he had noticed a safe in the bedroom that was fastened to the floor. Handshoe told Volbert and Nichols to go back and get the safe. At Handshoe's direction, Volbert grabbed a pry bar and then she and Nichols went back to Neal's home. While Volbert waited outside, Nichols went into the house, began tearing things up further, and then came outside with a safe. The two went back to the Kibby Street address, where Handshoe

let them in the back door. Handshoe and Nichols then both began trying to pry the safe open, and eventually got it opened. Volbert remembered seeing a motorcycle title, passport, and birth certificate, along with some money, inside the safe. Handshoe and Nichols split the cash between them. The three of them then went to Dairy Market, where they bought cigarettes and lottery tickets. Later, the three of them burned the papers from the safe in the fire pit that was out back of Volbert and Handshoe's house. Volbert estimated that the burglary took place shortly after noon on that day, and she knew Neal would not be home because he worked every day. The following day, police officers from the Lima Police Department showed up at the house on Kibby Street. Volbert and Handshoe were taken into custody and their house was searched by police, who found some of the stolen items in the house.

{¶17} Volbert was subsequently interviewed by Detective Boss and, because she was afraid of the consequences she might face from Handshoe, Volbert initially told Boss that Handshoe had nothing to do with the burglary at Neal's house. Later in the same conversation, Volbert came clean and told Boss about Handshoe's involvement in the burglary. Volbert also wrote a letter of apology to Michael Neal, explaining why she participated in the burglary. Volbert was ultimately formally charged for her part in the burglary and subsequently pled guilty to the charge. While the case was pending, Volbert wrote a letter to the judge and again said that Handshoe had nothing to do with the burglary. At trial, Volbert testified that she

wrote that letter to the judge because Handshoe had written her several dozen letters, cajoling her not to testify against him, telling her how much he loved her, and hinting that they could get married if she were to not testify against him and, instead, pin it all on Nichols.  Several of the letters from Handshoe to Volbert were identified by Volbert at trial and admitted into evidence.

{¶18} At trial, Volbert also identified State's Exhibit 16 as being video footage that showed some of the burglary incident.  After the video was played in the courtroom, Volbert testified that one portion of the video showed herself and Jordan Nichols in Michael Neal's backyard.  In a later segment of the video, Volbert identified Handshoe and Nichols as being the two men shown standing in the alleyway outside of Neal's house.

*First Assignment of Error*

{¶19} In the first assignment of error, Handshoe asserts that the trial court erred in permitting Ronda Volbert to testify about certain "bad acts" on Handshoe's part, being his involvement in her prostitution, threats he made to her in telling her to commit the burglary, and the fact he was physically violent towards her when she failed to heed his demands. On appeal, Handshoe argues that such testimony from Volbert constituted inadmissible evidence of Handshoe's prior bad acts pursuant to Evid.R. 404(B), after having objected to the evidence on that same basis at trial.

**{¶20}** "Generally, '[a] trial court is given broad discretion in admitting and excluding evidence, including "other bad acts" evidence.'" *State v. Wendel*, 3d Dist. Union No. 14-16-08, 2016-Ohio-7915, ¶ 23, quoting *State v. Williams*, 7th Dist. Jefferson No. 11 JE 7, 2013-Ohio-2314, ¶ 7, citing *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984). However, "[t]he admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law" which should be reviewed de novo. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22.

**{¶21}** "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, ¶ 36. "'However, there are exceptions to the general rule: "It may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."'" *State v. Bagley*, 3d Dist. Allen No. 1-13-31, 2014-Ohio-1787, ¶ 56, quoting *State v. May*, 3d Dist. Logan No. 8-11-19, 2012-Ohio-5128, ¶ 69, quoting Evid.R. 404(B). *See also* R.C. 2945.59. "'The list of acceptable reasons for admitting testimony of prior bad acts into evidence is non-exhaustive.'" *Bagley* at ¶ 56, quoting *State v. Persohn*, 7th Dist. Columbiana No. 11 CO 37, 2012-Ohio-6091, ¶ 23.

**{¶22}** It is important to note, however, that Evid.R. 404(B) only applies to "the admission of 'other acts' extrinsic to the charged offense and not those acts

intrinsic to the offense[.]" *State v. Lester*, 3d Dist. Union Nos. 14-18-21 and 14-18-22, 2020-Ohio-2988, ¶ 43, citing *State v. Hill*, 5th Dist. Stark No. 2018CA00077, 2019-Ohio-3432, ¶ 51-52, citing *Jordan v. Dayton Testing Lab.*, 2d Dist. Montgomery No. 19741, 2004-Ohio-2425, ¶ 48 and *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008). Put another way, Evid.R. 404(B) "does not bar evidence which is intrinsic to the crime being tried." *State v. Ash*, 7th Dist. Monroe No. 16 MO 0002, 2018-Ohio-1139, ¶ 60. "So-called 'other acts' are admissible if 'they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged.'" *Id.*, quoting *State v. Roe*, 41 Ohio St.3d 18, 23-24 (1989). "Consequently, a court can admit evidence of other acts which form the immediate background of and which are inextricably related to an act which forms the foundation of the charged offense." *Id.* Thus, Evid.R. 404(B) applies to the admission of "other acts" extrinsic to the charged offense and not those acts intrinsic to the offense because the latter are outside the purview of Evid.R. 404(B). *State v. Lester*, *supra*, ¶ 43, citing *State v. Hill*, *supra*, ¶ 51-52.

{¶23} In this case, while Handshoe's argument on appeal focuses on the admissibility of Volbert's testimony under Evid.R. 404(B), we conclude that Evid.R. 404(B) is not implicated here, as the testimony at issue related directly to actions of Handshoe that were intrinsic to the crime charged in the indictment.

Volbert's testimony about "bad acts" on Handshoe's part provided context for why Volbert participated in the burglary and, more importantly, served to establish the manner in which Handshoe was complicit in that crime.

{¶24} Complicity is codified in R.C. 2923.03, which in relevant part provides:

> (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> (1) Solicit or procure another to commit the offense;
>
> (2) Aid or abet another in committing the offense[.]

{¶25} In *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), the Supreme Court of Ohio defined what "complicity by aiding and abetting" means in the context of R.C. 2923.03(A)(2), holding that:

> To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*Johnson*, at syllabus.

{¶26} Further, to "solicit" another to commit an offense pursuant to R.C. 2923.03(A)(1) means "to seek, to ask, to influence, to invite, to tempt, to lead on, or to bring pressure to bear", and to "procure" another to commit an offense means "to get, obtain, induce, bring about, motivate." *State v. Smith*, 7th Dist. Belmont No. 15

BE 0064, 2017-Ohio-2708, ¶ 24, quoting *Ohio Jury Instructions*, CR Section 523.03(A)(6)-(7).

**{¶27}** Thus, in the instant case, the manner in which Ronda Volbert was influenced, pressured, motivated, induced, or otherwise encouraged or forced by Handshoe to commit the burglary went directly to whether complicity occurred. As the "bad acts" about which Volbert testified were part of the operative facts in this case and related specifically to the crime charged in the indictment, the trial court did not abuse its discretion in allowing that relevant, intrinsic evidence to be admitted.

**{¶28}** The first assignment of error is overruled.

*Second Assignment of Error*

**{¶29}** In the second assignment of error, Handshoe argues that the trial court erred in admitting into evidence State's Exhibit 16, which was video footage depicting portions of the burglary in progress outside the victim's home. Specifically, the exhibit was a video recorded on Patrolman Brandon Stephenson's body camera of a video playing on the victim's cell phone, a video which the victim had recorded with his phone of the original video playing on his brother's security system monitor. Handshoe asserts that this video should have been excluded from evidence because it was a "duplicate of a duplicate" that was not properly

authenticated and because the victim "manipulated" the phone video while playing it for the officer.

**{¶30}** "The admission or exclusion of evidence lies within the trial court's discretion, and a reviewing court should not reverse absent an abuse of discretion and material prejudice." *State v. Shellabarger*, 3d Dist. Allen No. 1-21-50, 2022-Ohio-4685, ¶ 8, citing *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. "Significantly, the trial court is vested with this discretion because it is in a much better position than we are to evaluate the authenticity of evidence. *Shellabarger*, ¶ 8, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 129.

**{¶31}** Pursuant to Evid.R. 901(A), authentication or identification is a condition precedent to admissibility of evidence and that requirement is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." The rule provides a non-exhaustive list of illustrations as examples of authentication conforming with the rule, including, pursuant to Evid.R. 901(B)(1), "testimony of a witness with knowledge that a matter is what it is claimed." The threshold for authentication is low and does not require conclusive proof of authenticity; rather, the proponent of the evidence need only demonstrate a "reasonable likelihood" that the evidence is authentic. *State v. Kammeyer*, 3d Dist. Seneca No. 13-19-48, 2020-Ohio-3842, ¶ 9.

**{¶32}** Photographic evidence, including videotapes, can be admitted under a "pictorial testimony" theory or a "silent witness" theory. *Kammeyer*, ¶ 10. "'Under the pictorial-testimony theory, evidence is admissible "when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on that witness' personal observation."'" *Id.,* citing *State v. Thyot*, 1st Dist. Hamilton Nos. C-170178 and C-170179, 2018-Ohio-644, ¶ 19, quoting *Midland Steel Prod. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121, 129-130, 573 N.E.2d 98 (1991). "'"In authenticating evidence through this method, there is no need to call the witness who took the photographs [or video] as long as a witness with knowledge can testify that the photograph is a fair and accurate depiction.'" *State v. Scott,* 12th Dist. No. CA2012–06–052, 2013-Ohio-2866, ¶ 36, quoting *State v. Freeze,* 12th Dist. No. CA2011–11–209, 2012-Ohio-5840, ¶ 66.

**{¶33}** Applying those standards to the instant case, the prosecution presented testimony that adequately established the authenticity of State's Exhibit 16. Michael Neal testified that he personally viewed the original surveillance video footage on his brother's computer monitor, but that his brother was unable to download the video to be copied directly so Neal then recorded some of that surveillance footage of the incident with his cell phone. Further, Patrolman Brandon Stephenson testified that he also personally viewed the original surveillance footage on Neal's brother's monitor, that the brother was not able to download the original

video in order for it to be copied, that Neal showed the officer the video Neal had recorded on his cellphone and that, while doing so, Stephenson's body camera recorded a video of Neal playing the video on his phone. Most importantly, Ronda Volbert also acknowledged that State's Exhibit 16 was video footage showing some of the burglary in which she was involved and present. After the video was played in the courtroom while Volbert was on the witness stand, she testified that one portion of the video showed herself and Jordan Nichols in Michael Neal's backyard. In a later segment of the video, Volbert identified Handshoe and Nichols as being the two men shown standing in the alleyway outside of Neal's house. That testimony from Volbert regarding State's Exhibit 16, combined with the explanations from Neal and Stephenson about how and why the duplicated video was made, sufficiently established that the exhibit was in fact what it purported to be.

{¶34} Handshoe also asserts that admission of the duplicate recording violated Evid.R. 1002 and Evid.R. 1003. Evid.R. 1002 provides, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio." One such exception is provided in Evid.R. 1003, which states "[a] duplicate is admissible to the same extent as an original unless (1) a genuine

question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

**{¶35}** The decision to admit duplicates is within the sound discretion of the trial court. *State v. Tibbetts,* 92 Ohio St.3d 146, 160, 749 N.E.2d 226 (2001). The party seeking to exclude a duplicate has the burden of demonstrating that the duplicate should be excluded. *Id.* A trial court does not abuse its discretion in admitting a duplicate where the party seeking to exclude the duplicate merely speculates regarding its authenticity. *See*, *e.g.*, S*tate v. Garcia,* 3d Dist. Hancock No. 5–01–12, 2001 WL 1031459 (Sept. 10, 2001).

**{¶36}** Contrary to Handshoe's position here, our review of the record shows that the defense did not meet its burden at trial in raising a genuine question as to the authenticity of the original video upon which State's Exhibit 16 was based, or in demonstrating that under the circumstances it would be unfair to admit the duplicate video in lieu of the original. The trial court therefore did not abuse its discretion in permitting the duplicated video to be admitted into evidence.

**{¶37}** Finally, Handshoe argues that State's Exhibit 16 should have been excluded because the victim, Michael Neal, "manipulated" the original video when recording portions of it with his cell phone.

**{¶38}** In this regard, we note that Neal testified that he had zoomed in on the video while playing it on his phone for Patrolman Stephenson. However, under

Evid.R. 1001(4), a "duplicate" also includes "a counterpart produced * * * by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording * * * or by other equivalent techniques which accurately reproduce the original." As Handshoe merely alleges, without strong support, that the enlarged duplicate may not have accurately represented the original video, and because the duplicated video was properly authenticated as discussed above, we find that this argument lacks merit and, again, the trial court did not abuse its discretion in determining State's Exhibit 16 to be admissible.

{¶39} The second assignment of error is overruled.

*Conclusion*

{¶40} Having found no error prejudicial to the defendant-appellant, Jon Handshoe, in the particulars assigned and argued, the judgment of the Allen County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**MILLER, P.J. and ZIMMERMAN, J., concur.**

**\*\* Judge Stephen W. Powell of the Twelfth District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**

**/jlr**